# WARTH ET AL. *v.* SELDIN ET AL.

No. 73–2024.   Argued March 17, 1975—Decided June 25, 1975

*Emmelyn Logan-Baldwin* argued the cause for petitioners. With her on the briefs were *Sanford Liebschutz* and *Michael Nelson.*

*James M. Hartman* argued the cause for respondents. With him on the brief were *Douglas S. Gates, J. William Ernstrom,* and *Luther C. Nadler.**

---

*Briefs of *amici curiae* urging reversal were filed by *Jack Greenberg, James M. Nabrit III, Charles Stephen Ralston,* and *Norman J. Chachkin* for the N. A. A. C. P. Legal Defense and Educational Fund, Inc.; by *Martin E. Sloane* and *Arthur D. Wolf* for the National Committee Against Discrimination in Housing; and by *J. Harold Flannery, Paul R. Dimond,* and *William E. Caldwell* for the Lawyers' Committee for Civil Rights Under Law.

*David H. Moskowitz* filed a brief for Regional Housing Legal Services, Inc., as *amicus curiae.*

Mr. Justice Powell delivered the opinion of the Court.

Petitioners, various organizations and individuals resident in the Rochester, N. Y., metropolitan area, brought this action in the District Court for the Western District of New York against the town of Penfield, an incorporated municipality adjacent to Rochester, and against members of Penfield's Zoning, Planning, and Town Boards. Petitioners claimed that the town's zoning ordinance, by its terms and as enforced by the defendant board members, respondents here, effectively excluded persons of low and moderate income from living in the town, in contravention of petitioners' First, Ninth, and Fourteenth Amendment rights and in violation of 42 U. S. C. §§ 1981, 1982, and 1983. The District Court dismissed the complaint and denied a motion to add petitioner Housing Council in the Monroe County Area, Inc., as party-plaintiff and also a motion by petitioner Rochester Home Builders Association, Inc., for leave to intervene as party-plaintiff. The Court of Appeals for the Second Circuit affirmed, holding that none of the plaintiffs, and neither Housing Council nor Home Builders Association, had standing to prosecute the action. 495 F. 2d 1187 (1974). We granted the petition for certiorari. 419 U. S. 823 (1974). For reasons that differ in certain respects from those upon which the Court of Appeals relied, we affirm.

## I

Petitioners Metro-Act of Rochester, Inc., and eight individual plaintiffs, on behalf of themselves and all persons similarly situated,[1] filed this action on January 24,

---

[1] Plaintiffs claimed to represent, pursuant to Fed. Rule Civ. Proc. 23 (b)(2), classes constituting "all taxpayers of the City of Rochester, all low and moderate income persons residing in the City of Rochester, all black and/or Puerto Rican/Spanish citizens residing

1972, averring jurisdiction in the District Court under 28 U. S. C. §§ 1331 and 1343. The complaint identified Metro-Act as a not-for-profit New York corporation, the purposes of which are "to alert ordinary citizens to problems of social concern; . . . to inquire into the reasons for the critical housing shortage for low and moderate income persons in the Rochester area and to urge action on the part of citizens to alleviate the general housing shortage for low and moderate income persons." [2] Plaintiffs Vinkey, Reichert, Warth, and Harris were described as residents of the city of Rochester, all of whom owned real property in and paid property taxes to that city.[3] Plaintiff Ortiz, "a citizen of Spanish/Puerto Rican extraction," App. 7, also owned real property in and paid taxes to Rochester. Ortiz, however, resided in Wayland, N. Y., some 42 miles from Penfield where he was employed.[4] The complaint described plaintiffs Broadnax, Reyes, and Sinkler as residents of Rochester and "persons fitting within the classification of low and moderate income as hereinafter defined. . . ." [5] *Ibid.* Al-

in the City of Rochester and all persons employed but excluded from living in the Town of Penfield who are affected or may in the future be affected by the defendants' policies and practices. . . ." App. 9.

[2] *Id.,* at 8–9.

[3] Plaintiff Harris was further described in the complaint as "a negro person who is denied certain rights by virtue of her race. . . ." App. 5. We find no indication in the record that Harris had either the desire or intent to live in Penfield were suitable housing to become available. Indeed, petitioners now appear to claim standing for Harris only on the ground that she is a taxpayer of Rochester. See Brief for Petitioners 9, 12.

[4] According to Ortiz' affidavit, submitted in answer to respondents' motion to dismiss, he was employed in Penfield from 1966 to May 1972. App. 366–367.

[5] In fact, however, the complaint nowhere defines the term "low and moderate income" beyond the parenthetical phrase "without the capital requirements to purchase real estate." *E. g., id.,* at 18.

though the complaint does not expressly so state, the record shows that Broadnax, Reyes, and Sinkler are members of ethnic or racial minority groups: Reyes is of Puerto Rican ancestry; Broadnax and Sinkler are Negroes.

Petitioners' complaint alleged that Penfield's zoning ordinance, adopted in 1962, has the purpose and effect of excluding persons of low and moderate income from residing in the town. In particular, the ordinance allocates 98% of the town's vacant land to single-family detached housing, and allegedly by imposing unreasonable requirements relating to lot size, setback, floor area, and habitable space, the ordinance increases the cost of single-family detached housing beyond the means of persons of low and moderate income. Moreover, according to petitioners, only 0.3% of the land available for residential construction is allocated to multifamily structures (apartments, townhouses, and the like), and even on this limited space, housing for low- and moderate-income persons is not economically feasible because of low density and other requirements. Petitioners also alleged that "in furtherance of a policy of exclusionary zoning," id., at 22, the defendant members of Penfield's Town, Zoning, and Planning Boards had acted in an arbitrary and discriminatory manner: they had delayed action on proposals for low- and moderate-cost housing for inordinate periods of time; denied such proposals for arbitrary and insubstantial reasons; refused to grant necessary variances and permits, or to allow tax abatements; failed to provide necessary support services for low- and moderate-cost housing projects; and had

---

In addition to the inadequacy of this definition, the record discloses wide variations in the income, housing needs, and money available for housing among the various "low and moderate income" plaintiffs. See Part III, infra.

amended the ordinance to make approval of such projects virtually impossible.

In sum, petitioners alleged that, in violation of their "rights, privileges and immunities secured by the Constitution and laws of the United States," *id.*, at 17, the town and its officials had made "practically and economically impossible the construction of sufficient numbers of low and moderate income . . . housing in the Town of Penfield to satisfy the minimum housing requirements of both the Town of Penfield and the metropolitan Rochester area . . . ." [6] Petitioners alleged, moreover, that by precluding low- and moderate-cost housing, the town's zoning practices also had the effect of excluding persons of minority racial and ethnic groups, since most such persons have only low or moderate incomes.

Petitioners further alleged certain harm to themselves. The Rochester property owners and taxpayers—Vinkey, Reichert, Warth, Harris, and Ortiz—claimed that because of Penfield's exclusionary practices, the city of Rochester had been forced to impose higher tax rates on them and others similarly situated than would otherwise have been necessary. The low- and moderate-income, minority plaintiffs—Ortiz, Broadnax, Reyes, and Sinkler—claimed that Penfield's zoning practices had prevented them from acquiring, by lease or purchase, residential property in the town, and thus had forced them and their families to reside in less attractive environments. To relieve these various harms, petitioners asked the District Court to declare the Penfield ordinance unconstitutional, to enjoin the defendants from enforcing the ordinance, to order the defendants to enact and administer a new ordinance designed to alleviate the effects of their past actions, and to award $750,-000 in actual and exemplary damages.

---

[6] App. 25–26.

On May 2, 1972, petitioner Rochester Home Builders Association, an association of firms engaged in residential construction in the Rochester metropolitan area, moved the District Court for leave to intervene as a party-plaintiff. In essence, Home Builders' intervenor complaint repeated the allegations of exclusionary zoning practices made by the original plaintiffs. It claimed that these practices arbitrarily and capriciously had prevented its member firms from building low- and moderate-cost housing in Penfield, and thereby had deprived them of potential profits. Home Builders prayed for equitable relief identical in substance to that requested by the original plaintiffs, and also for $750,000 in damages.[7] On June 7, 1972, Metro-Act and the other original plaintiffs moved to join petitioner Housing Council in the Monroe County Area, Inc., as a party plaintiff. Housing Council is a not-for-profit New York corporation, its membership comprising some 71 public and private organizations interested in housing problems. An affidavit accompanying the motion stated that 17 of Housing Council's member groups were or hoped to be involved in the development of low- and moderate-cost housing, and that one of its members—the Penfield Better Homes Corp.—"is and has been actively attempting to develop moderate income housing" in Penfield, "but has been stymied by its inability to secure the necessary approvals . . . ."[8]

Upon consideration of the complaints and of extensive supportive materials submitted by petitioners, the District Court held that the original plaintiffs, Home Builders, and Housing Council lacked standing to prosecute

---

[7] Home Builders also asked the District Court to enjoin the defendants from carrying out threatened retaliation against its members if Home Builders joined this litigation.

[8] *Id.,* at 174.

the action, that the original complaint failed to state a claim upon which relief could be granted, that the suit should not proceed as a class action, and that, in the exercise of discretion, Home Builders should not be permitted to intervene. The court accordingly denied the motion to add Housing Council as a party-plaintiff, denied Home Builders' motion to intervene, and dismissed the complaint. The Court of Appeals affirmed, reaching only the standing questions.

## II

We address first the principles of standing relevant to the claims asserted by the several categories of petitioners in this case. In essence the question of standing is whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues. This inquiry involves both constitutional limitations on federal-court jurisdiction and prudential limitations on its exercise. *E. g., Barrows* v. *Jackson,* 346 U. S. 249, 255–256 (1953). In both dimensions it is founded in concern about the proper—and properly limited—role of the courts in a democratic society. See *Schlesinger* v. *Reservists to Stop the War,* 418 U. S. 208, 221–227 (1974); *United States* v. *Richardson,* 418 U. S. 166, 188– 197 (1974) (POWELL, J., concurring).

In its constitutional dimension, standing imports justiciability: whether the plaintiff has made out a "case or controversy" between himself and the defendant within the meaning of Art. III. This is the threshold question in every federal case, determining the power of the court to entertain the suit. As an aspect of justiciability, the standing question is whether the plaintiff has "alleged such a personal stake in the outcome of the controversy" as to warrant *his* invocation of federal-court jurisdiction and to justify exercise of the court's remedial powers on

his behalf. *Baker* v. *Carr,* 369 U. S. 186, 204 (1962).[9] The Art. III judicial power exists only to redress or otherwise to protect against injury to the complaining party, even though the court's judgment may benefit others collaterally. A federal court's jurisdiction therefore can be invoked only when the plaintiff himself has suffered "some threatened or actual injury resulting from the putatively illegal action . . . ." *Linda R. S.* v. *Richard D.,* 410 U. S. 614, 617 (1973). See *Data Processing Service* v. *Camp,* 397 U. S. 150, 151–154 (1970).[10]

Apart from this minimum constitutional mandate, this Court has recognized other limits on the class of persons who may invoke the courts' decisional and remedial powers. First, the Court has held that when the asserted harm is a "generalized grievance" shared in substantially equal measure by all or a large class of citizens, that harm alone normally does not warrant exercise of jurisdiction. *E. g., Schlesinger* v. *Reservists to Stop the War, supra; United States* v. *Richardson, supra; Ex parte Lévitt,* 302 U. S. 633, 634 (1937). Second, even when the plaintiff has alleged injury sufficient to meet the "case or controversy" requirement, this Court has held that the plaintiff generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties. *E. g., Tileston* v. *Ullman,* 318 U. S. 44 (1943). See *United States* v. *Raines,* 362 U. S. 17 (1960); *Barrows* v.

---

[9] See P. Bator, P. Mishkin, D. Shapiro, & H. Wechsler, Hart & Wechsler's The Federal Courts and the Federal System 156 (2d ed. 1973).

[10] The standing question thus bears close affinity to questions of ripeness—whether the harm asserted has matured sufficiently to warrant judicial intervention—and of mootness—whether the occasion for judicial intervention persists. *E. g., Lake Carriers' Assn.* v. *MacMullan,* 406 U. S. 498 (1972); *Hall* v. *Beals,* 396 U. S. 45 (1969). See *Anti-Fascist Committee* v. *McGrath,* 341 U. S. 123, 154–156 (1951) (Frankfurter, J., concurring).

*Jackson, supra.* Without such limitations—closely related to Art. III concerns but essentially matters of judicial self-governance—the courts would be called upon to decide abstract questions of wide public significance even though other governmental institutions may be more competent to address the questions and even though judicial intervention may be unnecessary to protect individual rights. See, *e. g., Schlesinger* v. *Reservists to Stop the War,* 418 U. S., at 222.[11]

Although standing in no way depends on the merits of the plaintiff's contention that particular conduct is illegal, *e. g., Flast* v. *Cohen,* 392 U. S. 83, 99 (1968), it often turns on the nature and source of the claim asserted. The actual or threatened injury required by Art. III may exist solely by virtue of "statutes creating legal rights, the invasion of which creates standing . . . ." See *Linda R. S.* v. *Richard D., supra,* at 617 n. 3; *Sierra Club* v. *Morton,* 405 U. S. 727, 732 (1972). Moreover, the source of the plaintiff's claim to relief assumes critical importance with respect to the prudential rules of standing that, apart from Art. III's minimum requirements, serve to limit the role of the courts in resolving public disputes. Essentially, the standing question in such cases is whether the constitutional or statutory provision on which the claim rests properly can be understood as granting persons in the plaintiff's position a right to judicial relief.[12] In some circumstances, counter-

---

[11] Cf. Scott, Standing in the Supreme Court—A Functional Analysis, 86 Harv. L. Rev. 645 (1973).

[12] A similar standing issue arises when the litigant asserts the rights of third parties defensively, as a bar to judgment against him. *E. g., Barrows* v. *Jackson,* 346 U. S. 249 (1953); *McGowan* v. *Maryland,* 366 U. S. 420, 429–430 (1961). In such circumstances, there is no Art. III standing problem; but the prudential question is governed by considerations closely related to the question whether a person in the litigant's position would have a right of action on the claim. See Part IV, *infra.*

vailing considerations may outweigh the concerns underlying the usual reluctance to exert judicial power when the plaintiff's claim to relief rests on the legal rights of third parties. See *United States* v. *Raines,* 362 U. S., at 22–23. In such instances, the Court has found, in effect, that the constitutional or statutory provision in question implies a right of action in the plaintiff. See *Pierce* v. *Society of Sisters,* 268 U. S. 510 (1925); *Sullivan* v. *Little Hunting Park, Inc.,* 396 U. S. 229, 237 (1969). See generally Part IV, *infra.* Moreover, Congress may grant an express right of action to persons who otherwise would be barred by prudential standing rules. Of course, Art. III's requirement remains: the plaintiff still must allege a distinct and palpable injury to himself, even if it is an injury shared by a large class of other possible litigants. *E. g., United States* v. *SCRAP,* 412 U. S. 669 (1973). But so long as this requirement is satisfied, persons to whom Congress has granted a right of action, either expressly or by clear implication, may have standing to seek relief on the basis of the legal rights and interests of others, and, indeed, may invoke the general public interest in support of their claim. *E. g., Sierra Club* v. *Morton, supra,* at 737; *FCC* v. *Sanders Radio Station,* 309 U. S. 470, 477 (1940).

One further preliminary matter requires discussion. For purposes of ruling on a motion to dismiss for want of standing, both the trial and reviewing courts must accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party. *E. g., Jenkins* v. *McKeithen,* 395 U. S. 411, 421–422 (1969). At the same time, it is within the trial court's power to allow or to require the plaintiff to supply, by amendment to the complaint or by affidavits, further particularized allegations of fact deemed supportive of plaintiff's standing. If, after this oppor-

tunity, the plaintiff's standing does not adequately appear from all materials of record, the complaint must be dismissed.

### III

With these general considerations in mind, we turn first to the claims of petitioners Ortiz, Reyes, Sinkler, and Broadnax, each of whom asserts standing as a person of low or moderate income and, coincidentally, as a member of a minority racial or ethnic group. We must assume, taking the allegations of the complaint as true, that Penfield's zoning ordinance and the pattern of enforcement by respondent officials have had the purpose and effect of excluding persons of low and moderate income, many of whom are members of racial or ethnic minority groups. We also assume, for purposes here, that such intentional exclusionary practices, if proved in a proper case, would be adjudged violative of the constitutional and statutory rights of the persons excluded.

But the fact that these petitioners share attributes common to persons who may have been excluded from residence in the town is an insufficient predicate for the conclusion that petitioners themselves have been excluded, or that the respondents' assertedly illegal actions have violated their rights. Petitioners must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent. Unless these petitioners can thus demonstrate the requisite case or controversy between themselves personally and respondents, "none may seek relief on behalf of himself or any other member of the class." *O'Shea* v. *Littleton,* 414 U. S. 488, 494 (1974). See, *e. g., Bailey* v. *Patterson,* 369 U. S. 31, 32–33 (1962).

In their complaint, petitioners Ortiz, Reyes, Sinkler, and Broadnax alleged in conclusory terms that they are among the persons excluded by respondents' actions.[13] None of them has ever resided in Penfield; each claims at least implicitly that he desires, or has desired, to do so. Each asserts, moreover, that he made some effort, at some time, to locate housing in Penfield that was at once within his means and adequate for his family's needs. Each claims that his efforts proved fruitless.[14]

[13] Petitioner Ortiz also alleged that as a result of such exclusion he had to incur substantial commuting expenses between his residence and his former place of employment in Penfield; and, in supporting affidavits, each petitioner recites at some length the disadvantages of his or her present housing situation and how that situation might be improved were residence in Penfield possible. For purposes of standing, however, it is the exclusion itself that is of critical importance, since exclusion alone would violate the asserted rights quite apart from any objective or subjective disadvantage that may flow from it.

[14] In his affidavit submitted in opposition to respondents' motion to dismiss, petitioner Ortiz stated:

"Since my job at that time and continuing until May of 1972 was in the Town of Penfield, I initiated inquiries about renting and/or buying a home in the Town of Penfield. However, because of my income being low or moderate, I found that there were no apartment units large enough to house my family of wife and seven children, nor were there apartment units that were available reasonably priced so that I could even afford to rent the largest apartment unit. I have been reading ads in the Rochester metropolitan newspapers since coming to Rochester in 1966 and during that time and to the present time, I have not located either rental housing or housing to buy in Penfield." App. 37.

Petitioner Reyes averred that, for some time before locating and purchasing their present residence in Rochester, she and her husband had searched for a suitable residence in suburban communities: "[O]ur investigation for housing included the Rochester bedroom communities of Webster, Irondequoit, Penfield and Perinton. Our search over a period of two years led us to no possible purchase in any of these towns." Id., at 428. Petitioner Sinkler stated

We may assume, as petitioners allege, that respondents' actions have contributed, perhaps substantially, to the cost of housing in Penfield. But there remains the question whether petitioners' inability to locate suitable housing in Penfield reasonably can be said to have resulted, in any concretely demonstrable way, from respondents' alleged constitutional and statutory infractions. Petitioners must allege facts from which it reasonably could be inferred that, absent the respondents' restrictive zoning practices, there is a substantial probability that they would have been able to purchase or lease in Penfield and that, if the court affords the relief requested, the asserted inability of petitioners will be removed. *Linda R. S.* v. *Richard D.,* 410 U. S. 614 (1973).

We find the record devoid of the necessary allegations. As the Court of Appeals noted, none of these petitioners has a present interest in any Penfield property; none is himself subject to the ordinance's strictures; and none has ever been denied a variance or permit by respondent officials. 495 F. 2d, at 1191. Instead, petitioners claim that respondents' enforcement of the ordinance against third parties—developers, builders, and the like—has had the consequence of precluding the construction of housing suitable to their needs at prices they might be able to afford. The fact that the harm to petitioners may have resulted indirectly does not in itself preclude stand-

----

that she had "searched for alternate housing in the Rochester metropolitan area," including the town of Penfield, and had found that "a black person has no choice of housing . . . ." In particular, "there are no apartments available in the Town of Penfield which a person of my income level can afford." *Id.,* at 452–453. Petitioner Broadnax said only that she had "bought newspapers and read ads and walked to look for apartments until I found the place where I now reside. I found that there was virtually no choice of housing in the Rochester area." *Id.,* at 407.

ing. When a governmental prohibition or restriction imposed on one party causes specific harm to a third party, harm that a constitutional provision or statute was intended to prevent, the indirectness of the injury does not necessarily deprive the person harmed of standing to vindicate his rights. *E. g., Roe* v. *Wade,* 410 U. S. 113, 124 (1973). But it may make it substantially more difficult to meet the minimum requirement of Art. III: to establish that, in fact, the asserted injury was the consequence of the defendants' actions, or that prospective relief will remove the harm.

Here, by their own admission, realization of petitioners' desire to live in Penfield always has depended on the efforts and willingness of third parties to build low- and moderate-cost housing. The record specifically refers to only two such efforts: that of Penfield Better Homes Corp., in late 1969, to obtain the rezoning of certain land in Penfield to allow the construction of subsidized cooperative townhouses that could be purchased by persons of moderate income; and a similar effort by O'Brien Homes, Inc., in late 1971.[15] But

---

[15] Penfield Better Homes contemplated a series of one- to three-bedroom units and hoped to sell them—at that time—to persons who earned from $5,000 to $8,000 per year. The Penfield Planning Board denied the necessary variance on September 9, 1969, because of incompatibility with the surrounding neighborhood, projected traffic congestion, and problems of severe soil erosion during construction. *Id.,* at 629–633, 849–859, 883–884. O'Brien Homes, Inc., projected 51 buildings, each containing four family units, designed for single people and small families, and capable of being purchased by persons "of low income and accumulated funds" and "of moderate income with limited funds for down payment . . . ." *Id.,* at 634. The variance for this project was denied by the Planning Board on October 12, 1971; a revision of the proposal was reconsidered by the Planning Board in April 1972, and, from all indications of record, apparently remains under consideration. The record also indicates the existence of several proposals for "planned unit developments"; but we are not told whether these projects

the record is devoid of any indication that these projects, or other like projects, would have satisfied petitioners' needs at prices they could afford, or that, were the court to remove the obstructions attributable to respondents, such relief would benefit petitioners. Indeed, petitioners' descriptions of their individual financial situations and housing needs suggest precisely the contrary— that their inability to reside in Penfield is the consequence of the economics of the area housing market, rather than of respondents' assertedly illegal acts.[16]   In

---

would allow sale at prices that persons of low or moderate income are likely to be able to afford.   There is, more importantly, not the slightest suggestion that they would be adequate, and of sufficiently low cost, to meet these petitioners' needs.

[16] Ortiz states in his affidavit that he is now purchasing and resides in a six-bedroom dwelling in Wayland, N. Y.; and that he owns and receives rental income from a house in Rochester.   He is concerned with finding a house or apartment large enough for himself, his wife, and seven children, but states that he can afford to spend a maximum of $120 per month for housing.   *Id.*, at 370. Broadnax seeks a four-bedroom house or apartment for herself and six children, and can spend a maximum of about $120 per month for housing.   *Id.*, at 417–418.   Sinkler also states that she can spend $120 per month for housing for herself and two children. *Id.*, at 452–453.   Thus, at least in the cases of Ortiz and Broadnax, it is doubtful that their stated needs could have been satisfied by the small housing units contemplated in the only moderate-cost projects specifically described in the record.   Moreover, there is no indication that any of the petitioners had the resources necessary to acquire the housing available in the projects.   The matter is left entirely obscure. The income and housing budget figures supplied in petitioners' affidavits are presumably for the year 1972.   The vague description of the proposed O'Brien development strongly suggests that the units, even if adequate for their needs, would have been beyond the means at least of Sinkler and Broadnax.   See n. 15, *supra*.   The Penfield Better Homes projected price figures were for 1969, and must be assumed—even if subsidies might still be available—to have increased substantially by 1972, when the complaint was filed. Petitioner Reyes presents a special case: she states that her family

short, the facts alleged fail to support an actionable causal relationship between Penfield's zoning practices and petitioners' asserted injury.

In support of their position, petitioners refer to several decisions in the District Courts and Courts of Appeals, acknowledging standing in low-income, minority-group plaintiffs to challenge exclusionary zoning practices.[17]   In those cases, however, the plaintiffs challenged zoning restrictions as applied to particular projects that would supply housing within their means, and of which they were intended residents.   The plaintiffs thus were able to demonstrate that unless relief from assertedly illegal actions was forthcoming, their immediate and personal interests would be harmed.   Petitioners here assert no like circumstances. Instead, they rely on little more than the remote possibility, unsubstantiated by allegations of fact, that their situation might have been better had respondents acted otherwise, and might improve were the court to afford relief.

---

has an income of over $14,000 per year, that she can afford $231 per month for housing, and that, in the past and apparently now, she wants to purchase a residence.  As noted above, see n. 5, *supra,* the term "low and moderate income" is nowhere defined in the complaint; but Penfield Better Homes defined the term as between $5,000 and $8,000 per year.  See n. 15, *supra.*  Since that project was to be subsidized, presumably petitioner Reyes would have been ineligible.  There is no indication that in nonsubsidized projects, removal of the challenged zoning restrictions—in 1972— would have reduced the price on new single-family residences to a level that petitioner Reyes thought she could afford.

[17] See, *e. g., Park View Heights Corp.* v. *City of Black Jack,* 467 F. 2d 1208 (CA8 1972); *Crow* v. *Brown,* 457 F. 2d 788 (CA5 1972), aff'g 332 F. Supp. 382 (ND Ga. 1971); *Kennedy Park Homes Assn.* v. *City of Lackawanna,* 436 F. 2d 108 (CA2 1970), cert. denied, 401 U. S. 1010 (1971); *Dailey* v. *City of Lawton,* 425 F. 2d 1037 (CA10 1970).  Cf. *United Farmworkers of Florida Housing Project, Inc.* v. *City of Delray Beach,* 493 F. 2d 799 (CA5 1974).

We hold only that a plaintiff who seeks to challenge exclusionary zoning practices must allege specific, concrete facts demonstrating that the challenged practices harm *him*, and that he personally would benefit in a tangible way from the court's intervention.[18]  Absent the necessary allegations of demonstrable, particularized injury, there can be no confidence of "a real need to exercise the power of judicial review" or that relief can be framed "no broader than required by the precise facts to which the court's ruling would be applied." *Schlesinger* v. *Reservists to Stop the War,* 418 U. S., at 221-222.

## IV

The petitioners who assert standing on the basis of their status as taxpayers of the city of Rochester present a different set of problems.  These "taxpayer-petitioners" claim that they are suffering economic injury consequent to Penfield's allegedly discriminatory and exclusionary zoning practices.  Their argument, in brief, is that Penfield's persistent refusal to allow or to facilitate construction of low- and moderate-cost housing forces the city of Rochester to provide more such housing than it otherwise would do; that to provide such housing, Rochester must allow certain tax abatements; and

---

[18] This is not to say that the plaintiff who challenges a zoning ordinance or zoning practices must have a present contractual interest in a particular project.  A particularized personal interest may be shown in various ways, which we need not undertake to identify in the abstract.  But usually the initial focus should be on a particular project.  See, *e. g.,* cases cited in n. 17, *supra.*  We also note that zoning laws and their provisions, long considered essential to effective urban planning, are peculiarly within the province of state and local legislative authorities.  They are, of course, subject to judicial review in a proper case.  But citizens dissatisfied with provisions of such laws need not overlook the availability of the normal democratic process.

that as the amount of tax-abated property increases, Rochester taxpayers are forced to assume an increased tax burden in order to finance essential public services.

"Of course, pleadings must be something more than an ingenious academic exercise in the conceivable." *United States* v. *SCRAP,* 412 U. S., at 688. We think the complaint of the taxpayer-petitioners is little more than such an exercise. Apart from the conjectural nature of the asserted injury, the line of causation between Penfield's actions and such injury is not apparent from the complaint. Whatever may occur in Penfield, the injury complained of—increases in taxation—results only from decisions made by the appropriate Rochester authorities, who are not parties to this case.

But even if we assume that the taxpayer-petitioners could establish that Penfield's zoning practices harm them,[19] their complaint nonetheless was properly dismissed. Petitioners do not, even if they could, assert any personal right under the Constitution or any statute to be free of action by a neighboring municipality that may have some incidental adverse effect on Rochester. On the contrary, the only basis of the taxpayer-petitioners' claim is that Penfield's zoning ordinance and practices violate the constitutional and statutory rights of third parties, namely, persons of low and moderate income who are said to be excluded from Penfield. In short the claim of these petitioners falls squarely within the prudential standing rule that normally bars litigants from asserting the rights or legal interests of others in order to obtain relief from injury to themselves. As we have observed above, this rule of judicial self-governance is subject to exceptions, the most prominent of which is that Congress may remove it by statute. Here, how-

---

[19] Cf. *United States* v. *SCRAP,* 412 U. S. 669, 688–690 (1973). But see *Roe* v. *Wade,* 410 U. S. 113, 127–129 (1973).

ever, no statute expressly or by clear implication grants a right of action, and thus standing to seek relief, to persons in petitioners' position. In several cases, this Court has allowed standing to litigate the rights of third parties when enforcement of the challenged restriction against the litigant would result indirectly in the violation of third parties' rights. See, e. g., *Doe* v. *Bolton,* 410 U. S. 179, 188 (1973); *Griswold* v. *Connecticut,* 381 U. S. 479, 481 (1965); *Barrows* v. *Jackson,* 346 U. S. 249 (1953). But the taxpayer-petitioners are not themselves subject to Penfield's zoning practices. Nor do they allege that the challenged zoning ordinance and practices preclude or otherwise adversely affect a relationship existing between them and the persons whose rights assertedly are violated. *E. g., Sullivan* v. *Little Hunting Park, Inc.,* 396 U. S., at 237; *NAACP* v. *Alabama,* 357 U. S. 449, 458–460 (1958); *Pierce* v. *Society of Sisters,* 268 U. S., at 534–536. No relationship, other than an incidental congruity of interest, is alleged to exist between the Rochester taxpayers and persons who have been precluded from living in Penfield. Nor do the taxpayer-petitioners show that their prosecution of the suit is necessary to insure protection of the rights asserted, as there is no indication that persons who in fact have been excluded from Penfield are disabled from asserting their own right in a proper case.[20] In sum, we discern no justification for recognizing in the Rochester taxpayers a right of action on the asserted claim.

## V

We turn next to the standing problems presented by the petitioner associations—Metro-Act of Rochester,

---

[20] See generally Sedler, Standing to Assert Constitutional Jus Tertii in the Supreme Court, 71 Yale L. J. 599 (1962). Cf. *Bigelow* v. *Virginia,* 421 U. S. 809, 815–817 (1975).

Inc., one of the original plaintiffs; Housing Council in the Monroe County Area, Inc., which the original plaintiffs sought to join as a party-plaintiff; and Rochester Home Builders Association, Inc., which moved in the District Court for leave to intervene as plaintiff. There is no question that an association may have standing in its own right to seek judicial relief from injury to itself and to vindicate whatever rights and immunities the association itself may enjoy. Moreover, in attempting to secure relief from injury to itself the association may assert the rights of its members, at least so long as the challenged infractions adversely affect its members' associational ties. *E. g., NAACP* v. *Alabama, supra,* at 458–460; *Anti-Fascist Committee* v. *McGrath,* 341 U. S. 123, 183–187 (1951) (Jackson, J., concurring). With the limited exception of Metro-Act, however, none of the associational petitioners here has asserted injury to itself.

Even in the absence of injury to itself, an association may have standing solely as the representative of its members. *E. g., National Motor Freight Assn.* v. *United States,* 372 U. S. 246 (1963). The possibility of such representational standing, however, does not eliminate or attenuate the constitutional requirement of a case or controversy. See *Sierra Club* v. *Morton,* 405 U. S. 727 (1972). The association must allege that its members, or any one of them, are suffering immediate or threatened injury as a result of the challenged action of the sort that would make out a justiciable case had the members themselves brought suit. *Id.,* at 734–741. So long as this can be established, and so long as the nature of the claim and of the relief sought does not make the individual participation of each injured party indispensable to proper resolution of the cause, the association may be an appropriate representative of its members, entitled to invoke the court's jurisdiction.

## A

Petitioner Metro-Act's claims to standing on its own behalf as a Rochester taxpayer, and on behalf of its members who are Rochester taxpayers or persons of low or moderate income, are precluded by our holdings in Parts III and IV, *supra*, as to the individual petitioners, and require no further discussion. Metro-Act also alleges, however, that 9% of its membership is composed of present residents of Penfield. It claims that, as a result of the persistent pattern of exclusionary zoning practiced by respondents and the consequent exclusion of persons of low and moderate income, those of its members who are Penfield residents are deprived of the benefits of living in a racially and ethnically integrated community. Referring to our decision in *Trafficante* v. *Metropolitan Life Ins. Co.*, 409 U. S. 205 (1972), Metro-Act argues that such deprivation is a sufficiently palpable injury to satisfy the Art. III case-or-controversy requirement, and that it has standing as the representative of its members to seek redress.

We agree with the Court of Appeals that *Trafficante* is not controlling here. In that case, two residents of an apartment complex alleged that the owner had discriminated against rental applicants on the basis of race, in violation of § 804 of the Civil Rights Act of 1968, 82 Stat. 83, 42 U. S. C. § 3604. They claimed that, as a result of such discrimination, "they had been injured in that (1) they had lost the social benefits of living in an integrated community; (2) they had missed business and professional advantages which would have accrued if they had lived with members of minority groups; (3) they had suffered embarrassment and economic damage in social, business, and professional activities from being 'stigmatized' as residents of a 'white ghetto.'" 409 U. S., at 208. In light of the clear congressional purpose

in enacting the 1968 Act, and the broad definition of "person aggrieved" in § 810 (a), 42 U. S. C. § 3610 (a), we held that petitioners, as "person[s] who claim[ed] to have been injured by a discriminatory housing practice," had standing to litigate violations of the Act. We concluded that Congress had given residents of housing facilities covered by the statute an actionable right to be free from the adverse consequences to them of racially discriminatory practices directed at and immediately harmful to others. 409 U. S., at 212.

Metro-Act does not assert on behalf of its members any right of action under the 1968 Civil Rights Act, nor can the complaint fairly be read to make out any such claim.[21] In this, we think, lies the critical distinction between *Trafficante* and the situation here. As we have

---

[21] The *amicus* brief of the Lawyers' Committee for Civil Rights under Law argues, to the contrary, that petitioners' allegations do state colorable claims under the 1968 Act, and that Metro-Act's Penfield members are "person[s] aggrieved" within the meaning of § 810 (a). It is significant, we think, that petitioners nowhere adopt this argument. As we read the complaint, petitioners have not alleged that respondents "refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person *because of race, color, . . . or national origin,*" or that they "discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, *because of race, color, . . . or national origin.*" 42 U. S. C. §§ 3604 (a) and (b) (emphasis added). Instead, the gravamen of the complaint is that the challenged zoning practices have the purpose and effect of excluding persons of low and moderate income from residing in the town, and that this in turn has the consequence of excluding members of racial or ethnic minority groups. This reading of the complaint is confirmed by petitioners' brief in this Court. Brief for Petitioners 41. We intimate no view as to whether, had the complaint alleged purposeful racial or ethnic discrimination, Metro-Act would have stated a claim under § 804. See *Park View Heights Corp.* v. *City of Black Jack,* 467 F. 2d 1208 (CA8 1972).

observed above, Congress may create a statutory right or entitlement the alleged deprivation of which can confer standing to sue even where the plaintiff would have suffered no judicially cognizable injury in the absence of statute. *Linda R. S.* v. *Richard D.*, 410 U. S., at 617 n. 3, citing *Trafficante* v. *Metropolitan Life Ins., Co., supra,* at 212 (WHITE, J., concurring). No such statute is applicable here.

Even if we assume, *arguendo,* that apart from any statutorily created right the asserted harm to Metro-Act's Penfield members is sufficiently direct and personal to satisfy the case-or-controversy requirement of Art. III, prudential considerations strongly counsel against according them or Metro-Act standing to prosecute this action. We do not understand Metro-Act to argue that Penfield residents themselves have been denied any constitutional rights, affording them a cause of action under 42 U. S. C. § 1983. Instead, their complaint is that they have been harmed indirectly by the exclusion of others. This is an attempt to raise putative rights of third parties, and none of the exceptions that allow such claims is present here.[22] In these circumstances, we conclude that it is inappropriate to allow Metro-Act to invoke the judicial process.

**B**

Petitioner Home Builders, in its intervenor-complaint, asserted standing to represent its member firms engaged in the development and construction of residential housing in the Rochester area, including Penfield. Home Builders alleged that the Penfield zoning restrictions,

---

[22] Metro-Act does not allege that a contractual or other relationship protected under §§ 1981 and 1982 existed between its Penfield members and any particular person excluded from residing in the town, nor that any such relationship was either punished or disrupted by respondents. See *Sullivan* v. *Little Hunting Park,* 396 U. S. 229, 237 (1969).

together with refusals by the town officials to grant variances and permits for the construction of low- and moderate-cost housing, had deprived some of its members of "substantial business opportunities and profits." App. 156. Home Builders claimed damages of $750,000 and also joined in the original plaintiffs' prayer for declaratory and injunctive relief.

As noted above, to justify any relief the association must show that it has suffered harm, or that one or more of its members are injured. *E. g., Sierra Club* v. *Morton,* 405 U. S. 727 (1972). But, apart from this, whether an association has standing to invoke the court's remedial powers on behalf of its members depends in substantial measure on the nature of the relief sought. If in a proper case the association seeks a declaration, injunction, or some other form of prospective relief, it can reasonably be supposed that the remedy, if granted, will inure to the benefit of those members of the association actually injured. Indeed, in all cases in which we have expressly recognized standing in associations to represent their members, the relief sought has been of this kind. *E.g., National Motor Freight Assn.* v. *United States,* 372 U. S. 246 (1963). See *Data Processing Service* v. *Camp,* 397 U. S. 150 (1970). Cf. Fed. Rule Civ. Proc. 23 (b)(2).

The present case, however, differs significantly as here an association seeks relief in damages for alleged injuries to its members. Home Builders alleges no monetary injury to itself, nor any assignment of the damages claims of its members. No award therefore can be made to the association as such. Moreover, in the circumstances of this case, the damages claims are not common to the entire membership, nor shared by all in equal degree. To the contrary, whatever injury may have been suffered is peculiar to the individual member concerned, and both the fact and extent of injury would require individual-

ized proof. Thus, to obtain relief in damages, each member of Home Builders who claims injury as a result of respondents' practices must be a party to the suit, and Home Builders has no standing to claim damages on his behalf.

Home Builders' prayer for prospective relief fails for a different reason. It can have standing as the representative of its members only if it has alleged facts sufficient to make out a case or controversy had the members themselves brought suit. No such allegations were made. The complaint refers to no specific project of any of its members that is currently precluded either by the ordinance or by respondents' action in enforcing it. There is no averment that any member has applied to respondents for a building permit or a variance with respect to any current project. Indeed, there is no indication that respondents have delayed or thwarted any project currently proposed by Home Builders' members, or that any of its members has taken advantage of the remedial processes available under the ordinance. In short, insofar as the complaint seeks prospective relief, Home Builders has failed to show the existence of any injury to its members of sufficient immediacy and ripeness to warrant judicial intervention. See, *e. g., United Public Workers* v. *Mitchell*, 330 U. S. 75, 86–91 (1947); *Maryland Cas. Co.* v. *Pacific Coal & Oil Co.*, 312 U. S. 270, 273 (1941).

A like problem is presented with respect to petitioner Housing Council. The affidavit accompanying the motion to join it as plaintiff states that the Council includes in its membership "at least seventeen" groups that have been, are, or will be involved in the development of low- and moderate-cost housing. But, with one exception, the complaint does not suggest that any of these groups has focused its efforts on Penfield or has any specific

plan to do so. Again with the same exception, neither the complaint nor any materials of record indicate that any member of Housing Council has taken any step toward building housing in Penfield, or has had dealings of any nature with respondents. The exception is the Penfield Better Homes Corp. As we have observed above, it applied to respondents in late 1969 for a zoning variance to allow construction of a housing project designed for persons of moderate income. The affidavit in support of the motion to join Housing Council refers specifically to this effort, and the supporting materials detail at some length the circumstances surrounding the rejection of Better Homes' application. It is therefore possible that in 1969, or within a reasonable time thereafter, Better Homes itself and possibly Housing Council as its representative would have had standing to seek review of respondents' action. The complaint, however, does not allege that the Penfield Better Homes project remained viable in 1972 when this complaint was filed, or that respondents' actions continued to block a then-current construction project.[23] In short, neither the complaint nor the record supplies any basis from which to infer that the controversy between respondents and Better Homes, however vigorous it may once have been, remained a live, concrete dispute when this complaint was filed.

## VI

The rules of standing, whether as aspects of the Art. III case-or-controversy requirement or as reflections of pru-

---

[23] If it had been averred that the zoning ordinance or respondents were unlawfully blocking a pending construction project, there would be a further question as to whether Penfield Better Homes had employed available administrative remedies, and whether it should be required to do so before a federal court can intervene.

dential considerations defining and limiting the role of the courts, are threshold determinants of the propriety of judicial intervention. It is the responsibility of the complainant clearly to allege facts demonstrating that he is a proper party to invoke judicial resolution of the dispute and the exercise of the court's remedial powers. We agree with the District Court and the Court of Appeals that none of the petitioners here has met this threshold requirement. Accordingly, the judgment of the Court of Appeals is

*Affirmed.*

MR. JUSTICE DOUGLAS, dissenting.

With all respect, I think that the Court reads the complaint and the record with antagonistic eyes. There are in the background of this case continuing strong tides of opinion touching on very sensitive matters, some of which involve race, some class distinctions based on wealth.

A clean, safe, and well-heated home is not enough for some people. Some want to live where the neighbors are congenial and have social and political outlooks similar to their own. This problem of sharing areas of the community is akin to that when one wants to control the kind of person who shares his own abode. Metro-Act of Rochester, Inc., and the Housing Council in the Monroe County Area, Inc.—two of the associations which bring this suit—do in my opinion represent the communal feeling of the actual residents and have standing.

The associations here are in a position not unlike that confronted by the Court in *NAACP* v. *Alabama,* 357 U. S. 449 (1958). Their protest against the creation of this segregated community expresses the desire of their members to live in a desegregated community—a desire which gives standing to sue under the Civil Rights Act

of 1968 as we held in *Trafficante* v. *Metropolitan Life Ins. Co.*, 409 U. S. 205 (1972). Those who voice these views here seek to rely on other Civil Rights Acts and on the Constitution, but they too should have standing, by virtue of the dignity of their claim, to have the case decided on the merits.

Standing has become a barrier to access to the federal courts, just as "the political question" was in earlier decades. The mounting caseload of federal courts is well known. But cases such as this one reflect festering sores in our society; and the American dream teaches that if one reaches high enough and persists there is a forum where justice is dispensed. I would lower the technical barriers and let the courts serve that ancient need. They can in time be curbed by legislative or constitutional restraints if an emergency arises.

We are today far from facing an emergency. For in all frankness, no Justice of this Court need work more than four days a week to carry his burden. I have found it a comfortable burden carried even in my months of hospitalization.

As MR. JUSTICE BRENNAN makes clear in his dissent, the alleged purpose of the ordinance under attack was to preclude low- and moderate-income people and non-whites from living in Penfield. The zoning power is claimed to have been used here to foist an un-American community model on the people of this area. I would let the case go to trial and have all the facts brought out. Indeed, it would be better practice to decide the question of standing only when the merits have been developed.

I would reverse the Court of Appeals.

MR. JUSTICE BRENNAN, with whom MR. JUSTICE WHITE and MR. JUSTICE MARSHALL join, dissenting.

In this case, a wide range of plaintiffs, alleging various kinds of injuries, claimed to have been affected by the

Penfield zoning ordinance, on its face and as applied, and by other practices of the defendant officials of Penfield. Alleging that as a result of these laws and practices low- and moderate-income and minority people have been excluded from Penfield, and that this exclusion is unconstitutional, plaintiffs sought injunctive, declaratory, and monetary relief. The Court today, in an opinion that purports to be a "standing" opinion but that actually, I believe, has overtones of outmoded notions of pleading and of justiciability, refuses to find that any of the variously situated plaintiffs can clear numerous hurdles, some constructed here for the first time, necessary to establish "standing." While the Court gives lip service to the principle, oft repeated in recent years,[1] that "standing in no way depends on the merits of the plaintiff's contention that particular conduct is illegal," *ante,* at 500, in fact the opinion, which tosses out of court almost every conceivable kind of plaintiff who could be injured by the activity claimed to be unconstitutional, can be explained only by an indefensible hostility to the claim on the merits. I can appreciate the Court's reluctance to adjudicate the complex and difficult legal questions involved in determining the constitutionality of practices which assertedly limit residence in a particular municipality to those who are white and relatively well off, and I also understand that the merits of this case could involve grave sociological and political ramifications. But courts cannot refuse to hear a case on the merits merely because they would prefer not to, and it is quite clear, when the record is viewed with dispassion, that at least three of the groups of plaintiffs have made

---

[1] *Flast* v. *Cohen,* 392 U. S. 83, 99 (1968); *Data Processing Service* v. *Camp,* 397 U. S. 150, 153, 158 (1970); *Schlesinger* v. *Reservists to Stop the War,* 418 U. S. 208, 225 n. 15 (1974). See *Barlow* v. *Collins,* 397 U. S. 159, 176 (1970) (opinion of BRENNAN, J.).

allegations, and supported them with affidavits and documentary evidence, sufficient to survive a motion to dismiss for lack of standing.[2]

## I

Before considering the three groups I believe clearly to have standing—the low-income, minority plaintiffs, Rochester Home Builders Association, Inc., and the Housing Council in the Monroe County Area, Inc.—it will be helpful to review the picture painted by the allegations as a whole, in order better to comprehend the interwoven interests of the various plaintiffs. Indeed, one glaring defect of the Court's opinion is that it views each set of plaintiffs as if it were prosecuting a separate lawsuit, refusing to recognize that the interests are intertwined, and that the standing of any one group must take into account its position vis-à-vis the others. For example, the Court says that the low-income minority plaintiffs have not alleged facts sufficient to show that but for the exclusionary practices claimed, they would be able to reside in Penfield. The Court then intimates that such a causal relationship could be shown only if "the initial focus [is] on a particular project." *Ante,* at 508 n. 18. Later, the Court objects to the ability of the Housing Council to prosecute the suit on behalf of its member, Penfield Better Homes Corp., *despite* the fact that Better Homes *had* displayed an interest in a particular project, because that project was no longer live. Thus, we must suppose that even if the low-income plaintiffs had alleged a desire to live in the Better Homes project, that allegation would

---

[2] Because at least three groups of plaintiffs have, in my view, alleged standing sufficient to require this lawsuit to proceed to discovery and trial, I do not deal in this dissent with the standing of the remaining petitioners.

be insufficient because it appears that that particular project might never be built. The rights of low-income minority plaintiffs who desire to live in a locality, then, seem to turn on the willingness of a third party to litigate the legality of preclusion of a particular project, despite the fact that the third party may have no economic incentive to incur the costs of litigation with regard to one project, and despite the fact that the low-income minority plaintiffs' interest is *not* to live in a particular project but to live somewhere in the town in a dwelling they can afford.

Accepting, as we must, the various allegations and affidavits as true, the following picture emerges: The Penfield zoning ordinance, by virtue of regulations concerning "lot area, set backs, . . . population density, density of use, units per acre, floor area, sewer requirements, traffic flow, ingress and egress[, and] street location," makes "practically and economically impossible the construction of sufficient numbers of low and moderate income" housing. App. 25. The *purpose* of this ordinance was to preclude low- and moderate-income people and nonwhites from living in Penfield, *id.*, at 15, and, particularly because of refusals to grant zoning variances and building permits and by using special permit procedures and other devices, *id.*, at 17, the defendants succeeded in keeping "low and moderate income persons . . . and non-white persons . . . from residing within . . . Penfield." *Id.*, at 18.

As a result of these practices, various of the plaintiffs were affected in different ways. For example, plaintiffs Ortiz, Reyes, Sinkler, and Broadnax, persons of low or moderate income and members of minority groups, alleged that *"as a result"* of respondents' exclusionary scheme, *id.*, at 18, 21, 23–24, 26, 29 (emphasis supplied), they could not live in Penfield, although they

desired and attempted to do so, and consequently incurred greater commuting costs, lived in substandard housing, and had fewer services for their families and poorer schools for their children than if they had lived in Penfield. Members of the Rochester Home Builders Association were prevented from constructing homes for low- and moderate-income people in Penfield, *id.*, at 153, harming them economically. And Penfield Better Homes, a member of the Housing Council, was frustrated in its attempt to build moderate-income housing, *id.*, at 174.

Thus, the portrait which emerges from the allegations and affidavits is one of total, purposeful, intransigent exclusion of certain classes of people from the town, pursuant to a conscious scheme never deviated from. Because of this scheme, those interested in building homes for the excluded groups were faced with insurmountable difficulties, and those of the excluded groups seeking homes in the locality quickly learned that their attempts were futile. Yet, the Court turns the very success of the allegedly unconstitutional scheme into a barrier to a lawsuit seeking its invalidation. In effect, the Court tells the low-income minority and building company plaintiffs they will not be permitted to prove what they have alleged—that they could and would build and live in the town if changes were made in the zoning ordinance and its application—because they have not succeeded in breaching, before the suit was filed, the very barriers which are the subject of the suit.

## II

### *Low-income and Minority Plaintiffs*

As recounted above, plaintiffs Ortiz, Broadnax, Reyes, and Sinkler alleged that "as a result" of respondents' exclusionary practices, they were unable, despite at-

tempts, to find the housing they desired in Penfield, and consequently have incurred high commuting expenses, received poorer municipal services,[3] and, in some instances, have been relegated to live in substandard housing.[4] The Court does not, as it could not, suggest that

[3] Specifically, petitioner Ortiz claims, among other things, that the Penfield schools offer a much broader curriculum, including vocational education, than the school his children attend, as well as special tutoring and counseling programs not available to his children. Penfield also provides a comprehensive recreational program, while his community offers very little, and a full-time, comprehensive public library, while his community has only limited library services. App. 377–400.

Petitioner Broadnax claimed that if she lived in Penfield, there would be playgrounds for her children, effective police protection, and adequate garbage disposal, all of which are lacking in her present community. *Id.*, at 419. As a result, her children are not safe and there are mice, rats, and roaches in her house. *Id.*, at 416–417, 419.

Petitioner Reyes stated, similarly, that she is currently living with inadequate police protection, *id.*, at 426, and sending her children to inferior schools, *id.*, at 433.

Finally, petitioner Sinkler also said that in her current home, police protection is inadequate, *id.*, at 443, there are no play areas for children, *id.*, at 449, and the schools are totally inadequate. *Id.*, at 454.

These are only summaries of the affidavits, which are quite specific in detailing the inadequacies of petitioners' current communities and the injuries suffered thereby as well as, in Ortiz' affidavit, the services provided by Penfield which would alleviate many of these problems.

[4] Petitioner Broadnax said that because of the poor choice of housing available at her income, she was forced to rent an apartment which has "many leaks in the roof, bad wiring, roach infestation, rat and mice infestation, crumbling house foundation, broken front door, broken hot water heater, etc." *Id.*, at 410. As a result, aside from the ordinary dangers such conditions obviously present, one son's asthma condition has been exacerbated. *Id.*, at 413.

Petitioner Sinkler stated that, again because only housing in

the injuries, if proved, would be insufficient to give petitioners the requisite "personal stake in the outcome of the controversy as to assure the concrete adverseness which sharpens the presentation of issues," *Baker* v. *Carr*, 369 U. S. 186, 204 (1962) ; *Flast* v. *Cohen*, 392 U. S. 83, 99 (1968). Rather, it is abundantly clear that the harm *alleged* satisfies the "injury in fact, economic or otherwise," *Data Processing Service* v. *Camp*, 397 U. S. 150, 152 (1970), requirement which is prerequisite to standing in federal court. The harms claimed—consisting of out-of-pocket losses as well as denial of specifically enumerated services available in Penfield but not in these petitioners' present communities, see nn. 3 and 4, *supra*—are obviously *more* palpable and concrete than those held sufficient to sustain standing in other cases. See *United States* v. *SCRAP*, 412 U. S. 669, 686 (1973) ; *Sierra Club* v. *Morton*, 405 U. S. 727, 735 n. 8, 738, and n. 13 (1972). Cf. *Data Processing*, *supra*, at 154.

Instead, the Court insists that these petitioners' allegations are insufficient to show that the harms suffered were *caused* by respondents' allegedly unconstitutional practices, because "their inability to reside in Penfield [may be] the consequence of the economics of the area housing market, rather than of respondents' assertedly illegal acts." *Ante*, at 506.

True, this Court has held that to maintain standing, a plaintiff must not only allege an injury but must also assert a " 'direct' relationship between the alleged injury

---

Rochester central city is available to moderate-income, minority people, she is living in a seventh-floor apartment with exposed radiator pipes, no elevator, and no screens, and violence, theft, and sexual attacks are frequent. *Id.*, at 441–446.

Once again, the above are short summaries of long, detailed accounts of the harms suffered.

and the claim sought to be adjudicated," *Linda R. S.* v. *Richard D.,* 410 U. S. 614, 618 (1973)—that is, "[t]he party who invokes [judicial] power must be able to show . . . that he has sustained or is immediately in danger of sustaining some direct injury *as the result* of [a statute's] enforcement." *Massachusetts* v. *Mellon,* 262 U. S. 447, 488 (1923) (emphasis supplied); *Linda R. S., supra,* at 618. But as the allegations recited above show, these petitioners have alleged precisely what our cases require—that *because* of the exclusionary practices of respondents, they cannot live in Penfield and have suffered harm.[5]

Thus, the Court's real holding is not that these petitioners have not *alleged* an injury resulting from respondents' action, but that they are not to be allowed to prove one, because "realization of petitioners' desire to live in Penfield always has depended on the efforts and willingness of third parties to build low- and moderate-cost housing," *ante,* at 505, and "the record is devoid of any indication that . . . [any] projects, would have satisfied petitioners' needs at prices they could afford." *Ante,* at 506.

Certainly, this is not the sort of demonstration that can or should be required of petitioners at this preliminary stage. In *SCRAP, supra,* a similar challenge was made: it was claimed that the allegations were vague, 412 U. S., at 689 n. 15, and that the causation theory

---

[5] This case is quite different from *Linda R. S.* v. *Richard D.* In *Linda R. S.,* the problem was that even if everything alleged were proved, it was still quite possible that petitioner's husband would not be prosecuted for nonsupport, or that, if prosecuted, he would still not contribute to his children's support. Nothing which could be proved at trial could possibly show otherwise. Here, if these petitioners prove what they have alleged, they will have shown that respondents' actions did cause their injury.

asserted was untrue, *id.,* at 689. We said: "If . . . these allegations were in fact untrue, then the appellants should have moved for summary judgment on the standing issue and demonstrated to the District Court that the allegations were sham and raised no genuine issue of fact. We cannot say . . . that the appellees could not prove their allegations which, if proved, would place them squarely among those persons injured in fact." *Id.,* at 689–690.[6] See also *Jenkins* v. *McKeithen,* 395 U. S. 411, 421–422 (1969).

Here, the very fact that, as the Court stresses, these petitioners' claim rests in part upon proving the intentions and capabilities of third parties to build in Penfield suitable housing which they can afford, coupled with the exclusionary character of the claim on the merits, makes it particularly inappropriate to assume that these petitioners' lack of specificity reflects a fatal weakness in their theory of causation.[7] Obviously they cannot be ex-

---

[6] There is some suggestion made in the briefs that, by virtue of the inclusion in the record of affidavits and documents, the motion to dismiss was, under Fed. Rule Civ. Proc. 12 (b), converted into a Rule 56 motion for summary judgment. In terms, the portion of Rule 12 (b) concerning conversion to a Rule 56 motion applies only to a motion to dismiss for failure to state a cause of action, and not to a motion to dismiss for other reasons. At any rate, respondents filed no counter-affidavits proper under Rule 56 (e), so that even if Rule 56 were applied, respondents have not at this stage disproved the allegations.

[7] The Court, glancing at the projects mentioned in the record which might have been built but for the exclusionary practices alleged, concludes that petitioners Ortiz and Broadnax earned too little to afford suitable housing in them, and that petitioner Reyes earned too much. *Ante,* at 506–507, n. 16. As the Court implicitly acknowledges, petitioner Sinkler at least may well have been able to live in the Better Homes Project. Further, there appears in the record as it stands a report of the Penfield Housing Task Force on Moderate Income Housing, App. 487–581, prepared for the Pen-

pected, prior to discovery and trial, to know the future plans of building companies, the precise details of the housing market in Penfield, or everything which has transpired in 15 years of application of the Penfield zoning ordinance, including every housing plan suggested and refused. To require them to allege such facts is to require them to prove their case on paper in order to get into court at all, reverting to the form of fact pleading long abjured in the federal courts. This Court has not required such unachievable specificity in standing cases in the past, see *SCRAP, supra,* and *Jenkins, supra,* and the fact that it does so now can only be explained by an indefensible determination by the Court to close the doors of the federal courts to claims of this kind. Understandably, today's decision will be read as revealing hostility to breaking down even unconstitutional zoning

---

field Town Board itself, which defines *"moderate income families* as families having incomes between $5,500 and $11,000 per year, depending on the size of the family," *id.,* at 492, and moderate-income housing as housing "priced below $20,000 or [carrying] a rental price of less than $150 a month," *id.,* at 493. See also, with respect to "low income," *id.,* at 527. Thus, while the Court might not know what was meant by "low" and "moderate" income housing, *ante,* at 494–495, n. 5, and 506–507, n. 16, respondents clearly did. The petitioners here under discussion fell within the Board's own definition of moderate-income families, except for petitioner Reyes, who alleges that she could afford a house for $20,000 but not more. App. 428. And the Task Force Report *does* set out, *id.,* at 503–516, changes in the zoning ordinance and its application which could result in housing which moderate-income people could afford, even to the extent of setting out a budget provided by a builder for a house costing $18,900, *id.,* at 507. The causation theory which the Court finds improbable, then, was adopted by a task force of the Town Board itself. Of course, we do not know at this stage whether the particular named plaintiffs would *certainly* have benefited from the changes recommended by the task force, but at least there is a good chance that, after discovery and trial, they could show they would.

barriers that frustrate the deep human yearning of low-income and minority groups for decent housing they can afford in decent surroundings, see nn. 3 and 4, *supra.*

## III

### *Associations Including Building Concerns*

Two of the petitioners are organizations among whose members are building concerns. Both of these organizations, Home Builders and Housing Council, alleged that these concerns have attempted to build in Penfield low- and moderate-income housing, but have been stymied by the zoning ordinance and refusal to grant individual relief therefrom.

Specifically, Home Builders, a trade association of concerns engaged in constructing and maintaining residential housing in the Rochester area, alleged that "[d]uring the past 15 years, over 80% of the private housing units constructed in the Town of Penfield have been constructed by [its] members." App. 147. Because of respondents' refusal to grant relief from Penfield's restrictive housing statutes, members of Home Builders could not proceed with planned low- and moderate-income housing projects, *id.,* at 157, and thereby lost profits. *Id.,* at 156.

Housing Council numbers among its members at least 17 groups involved in the development and construction of low- and middle-income housing. In particular, one member, Penfield Better Homes, *"is* and has been actively attempting to develop moderate income housing in . . . Penfield" (emphasis supplied), *id.,* at 174, but has been unable to secure the necessary approvals. *Ibid.*

The Court finds that these two organizations lack standing to seek prospective relief for basically the same reasons: none of their members is, as far as the allegations show, *currently* involved in developing a *particular*

project. Thus, Home Builders has "failed to show the existence of any injury to its members *of sufficient immediacy and ripeness* to warrant judicial intervention," *ante,* at 516 (emphasis supplied), while "the controversy between respondents and Better Homes, however vigorous it may once have been, [has not] remained a live, concrete dispute." *Ante,* at 517.

Again, the Court ignores the thrust of the complaints and asks petitioners to allege the impossible. According to the allegations, the building concerns' experience in the past with Penfield officials has shown any plans for low- and moderate-income housing to be futile for, again according to the allegations, the respondents are engaged in a purposeful, conscious scheme to exclude such housing. Particularly with regard to a low- or moderate-income project, the cost of litigating, with respect to any particular project, the legality of a refusal to approve it may well be prohibitive. And the merits of the exclusion of this or that project is not at the heart of the complaint; the claim is that respondents will not approve *any* project which will provide residences for low- and moderate-income people.

When this sort of pattern-and-practice claim is at the heart of the controversy, allegations of past injury, which members of both of these organizations have clearly made, and of a future intent, if the barriers are cleared, again to develop suitable housing for Penfield, should be more than sufficient. The past experiences, if proved at trial, will give credibility and substance to the claim of interest in future building activity in Penfield. These parties, if their allegations are proved, certainly have the requisite personal stake in the outcome of *this* controversy, and the Court's conclusion otherwise is only a conclusion that *this* controversy may not be litigated in a federal court.

I would reverse the judgment of the Court of Appeals.