In the Matter of the PRESBYTERIAN HOSPITAL IN THE CITY OF NEW YORK, Petitioner, v HOLLIS S. INGRAHAM, AS COMMISSIONER OF HEALTH OF THE STATE OF NEW YORK, et al., Respondents.

First Department, July 1, 1975

*Jeffrey A. Barist* of counsel *(W. Neil Thomas, II,* and *Allan L. Gropper* with him on the brief; *White & Case,* attorneys), for petitioner.

*Donald B. da Parma* of counsel *(Robert A. Bicks* and *Alan C. Drewsen* with him on the brief; *Breed, Abbott & Morgan,* attorneys), for Associated Hospital Service of New York, respondent.

*Jesse J. Fine* of counsel *(Samuel A. Hirshowitz* with him on the brief; *Louis J. Lefkowitz, Attorney-General),* for Hollis S. Ingraham and another, respondents.

LANE, J. The Presbyterian Hospital of the City of New York (the Hospital) is seeking a review of payment allocations made through the Associated Hospital Service of New York (AHS) and approved by the State Commissioner of Health (Commissioner) for the years 1970 and 1971.

Prior to May, 1969, AHS reimbursed hospitals for their expenses on the basis of actual outlay by each hospital. However, the Legislature found that hospital costs were rising at an alarming rate and were attributable in large part to continued pressure for unnecessary duplication of facilities and inefficient management (L 1969, ch 957, § 2).

The Public Health Law was therefore amended by passage of the "Cost Control Act of 1969" (L 1969, ch 957). The new statute authorized the Commissioner to certify to the Superintendent of Insurance and the State Director of the Budget proposed rate schedules for reimbursement to hospital- and health-related facilities. These rate schedules were to be "reasonably related to the costs of efficient production" of the service rendered (Public Health Law, § 2807, subd 3). The formula to be utilized was to take into account, *inter alia,* geographical location of the facility and the economic factors

attendant thereon, costs of hospitals of comparable size, and the implementation of joint use. Participants in the formula were divided into 14 different groups so that, for example, the Hospital was classified as part of Group 1; that is, a teaching hospital located in an urban area. The formula treated each group as a unit in establishing rates.

The formula contemplated establishing rates of payment on a prospective basis in order to limit hospital expenditures. Hospitals were to be advised in advance of the rate which would be allowed and they could then establish their budgets accordingly. Such a formula applied in a manner consistent with statutory authority and goals must not be overturned except for "weighty reasons" (Matter of Sigety v Ingraham, 29 NY2d 110, 114).

· The formula applied in the case at bar first required collecting data on actual hospital costs for a given year. The data were provided by the hospitals. The year for which actual hospital costs were used was denominated as the base year. The base-year figure was then "trended" to the next calendar year by adding to base-year expenses the costs of this intermediate "trended" year, which costs were culled from hospital operating data submitted by members of each hospital group for the current year. The percentage increase from base year to trending year, coupled with a revision based on projected movement of specific economic indices of the general economy bearing on relationship to the hospital economy, was then fused to calculate the rate of return for the coming year. So, for example, to calculate the costs for 1970, 1968 actual cost figures were used; 1968 was the base year, 1969 the trending year, and consideration of the increases in cost between 1968 and 1969, plus consideration of other economic factors, resulted in the allowable rate projected for the year 1970.

The base-year figures themselves were divided into three categories: Operating costs per diem, nonoperating costs per diem, and a community service factor.

In broad strokes, these terms are defined as follows: Operating costs were computed by adding together actual expenses incurred in providing inpatient service. This total cost was then divided by the total annual "patient days" and the quotient was the figure used for reimbursement in the subsequent year. The formula defined a "patient day" as the unit of measure denoting lodging facilities provided and services rendered to one patient between the hospital census-taking hours

on two successive days. Patient days were further weighted by multiplying private-room days by 115%.

It must be observed that the greater the number of patient days, the smaller the quotient arrived at and the less compensation received per "patient day." Conversely, the fewer the patient days, the greater the quotient arrived at, assuming, of course, that in both instances the same total expense is used. Therefore, if for example the number of patient days to be allowed was frozen, and in a subsequent year there was an actual decrease in patient days, the amount of money allowed per patient day would be less than if the lesser number of patient days were used as the divisor of total expenditures.

The nonoperating expenses involve capital costs and interest on capital indebtedness. The capital costs and depreciation encompassed only those items in service and depreciated in the base year in question.

The final segment in computing base-year costs was the community service factor, which allowed reimbursement for outpatient care to ambulatory patients. This was allowed since normally, in an urban setting, these services must be offered, are generally offered gratis or at a rate well below actual cost, and are a vital community service, continuation of which was to be encouraged. However, the total allowance for community service factor was not to be in excess of 5% of total operating costs.

The objection raised in the dissent as to the formula's computation of the community service factor is not well taken.

It is to be noted that the allowance of reimbursement for the community service factor is discretionary (Public Health Law, § 2807; 10 NYCRR 86.2 [d]). In essence, it is a subsidy to the hospital for losses which as a rule are not generated by AHS subscribers.

Nonetheless, in recognition of the importance of this type of outpatient care, *some* reimbursement was allowed.

The community service factor reimbursement, as formulated, intended to exclude any expense or income related to hospital capital items on the theory that it was not properly part of the hospital's cash losses expended for such service. To that end, capital depreciation was excluded as an expense. To offset the exclusion of that expense, contributions and income from unrestricted endowment funds, which items are traditionally utilized for new construction and capital outlays, were

not itemized as hospital income. However, depreciation was, of course, allowed as an expense in considering the nonoperating per diem costs.

Similarly, the income from private-room use in excess of the AHS reimbursement was included as income to offset community service factor expenses.

The per diem amount of private-room income was then deducted from the per diem community service factor calculated in order that out-of-pocket payments by subscribers be offset against what amounts to a subsidy. The community service factor portion of the formula, therefore, in fact achieved the purpose intended; namely, partial reimbursement of the hospital for cash losses expended in the providing of free outpatient services.

Chapter 15 of the formula allowed for a review procedure, followed, if requested by the hospital seeking review, by a formal hearing and a recommendation to the review committee. After the review committee analyzed the report of the hearing officer, it could either confirm or modify that report. Both recommendations would then go to the Commissioner, whose decision would be the final administrative determination made. From there, a party aggrieved would be entitled to further judicial review.

At the hearing, the hospital affected could demonstrate that the application of the group reimbursement formula was unreasonable or inequitable. The Hospital obtained such formal review, which resulted in recommendations by the hearing officer for additional reimbursement for the year 1970. The Commissioner ultimately modified that recommendation in part.

Petitioners now seek judicial review. While the proceeding was transferred to this court to determine an issue of substantial evidence (CPLR 7803, subd 4; 7804, subd [g]), we note that the hearing afforded was not mandated by statute and the issues should have been determined at Special Term. We nonetheless have the power to review *de novo* (CPLR 7804, subd [g]).

It must be noted, however, that our scope of review is limited to a determination as to whether or not the rate formula was ultimately approved in an arbitrary and capricious manner.

The Hospital challenged the freezing of patient days,

weighting of private-patient days, and use of a group average increase, both before the hearing officer and on appeal. The hearing officer aptly noted that to recompute the rate by use of actual costs divided by actual unweighted patient days would totally vitiate the concept of prospectivity upon which the formula is based.

We concede that the application of a general formula to a group will of necessity not work equally as well for each individual member of the group. However, adjustments made on review were intended by the formula to cover gross inequities with resultant impairment or inability to function of any given hospital unit. Taken in this context, even the utilization of weighted patient days with regard to private rooms cannot be said to be arbitrary or capricious. We would therefore agree that the operating costs allowed should not be disturbed.

On the issue of nonoperating costs, the hearing officer noted that construction of buildings and fixtures for which 1970 depreciation is claimed was undertaken prior to the enactment of the cost control statute and, to that extent, the Hospital could not anticipate the effect or even the existence of the 1970 formula. He therefore recommended additional reimbursement to the Hospital to the extent of a recomputation to include depreciation claimed for the items noted in Exhibit 17, exclusive of a cardiac intensive care unit and a parking lot addition.

The Commissioner confirmed this portion of the referee's report. We would modify the allowance to the extent that we would include the cardiac intensive care unit in the recomputation of depreciation expenses allowed. This item was a major capital expense (costing $248,069) and was certainly hospital-oriented, and an inadequate explanation was given for its exclusion. Depreciation as claimed for the year 1970 (in the amount of $11,745) should therefore have been allowed.

As to the 1971 depreciation allowed, no adjustments were made and we agree that none should be made. The Hospital by then knew of the formula and its operation and could have modified its budget accordingly.

As to the community service factor, the hearing officer recommended waiver of the 5% cost ceiling which, though rejected by the review committee, was approved by the Commissioner. However, he allowed 1970 actual cost figures to be used rather than 1968 base-year figures. The Commissioner overruled this recommendation and found that 1968 figures

should be utilized. We agree with the Commissioner. The use of 1970 figures would not be in adherence to the statutory goal of limiting costs and reimbursing on a prospective basis.

Accordingly, the determination of the Commissioner should be modified on the law to the extent of including in the recomputation of 1970 nonoperating costs the cost of the cardiac intensive care unit and otherwise confirmed, without costs and without disbursements.

YESAWICH, J. (dissenting). The method used by the Commissioner to compute the community service factor in the 1971 reimbursement formula was arbitrary and capricious in that income from private rooms was counted twice and depreciation on those items which, under the Commissioner's regulations were required to be funded, was treated as an income item but not as an expense item. Unanswered and unexplained is how reliance on these unsound, if not bizarre, accounting techniques enabled the Commissioner to meet the statutory mandate that the reimbursement rate be "reasonably related to the costs of efficient production".

The Commissioner's determination should, therefore, be modified not only to the extent indicated by the majority but additionally in accordance with the views expressed herein.

STEVENS, P. J., and NUNEZ, J., concur with LANE, J.; MURPHY and YESAWICH, JJ., dissent in an opinion by YESAWICH, J.

Determination of respondent Health Commissioner, dated April 5, 1974, modified, on the law, to the extent of including in the recomputation of 1970 nonoperating costs the cost of the cardiac intensive care unit and otherwise confirmed, without costs and without disbursements.