NATIONAL UNION OF HOSPITAL AND HEALTH CARE EMPLOYEES, RWDSU, AFL–CIO, and District 1199, National Union of Hospital and Health Care Employees, RWDSU, AFL–CIO, Plaintiffs-Appellants,

v.

Hugh CAREY, Governor of the State of New York, and Robert P. Whalen, Commissioner of Health of the State of New York, Defendants-Appellees.

No. 40, Docket 76–7203.

United States Court of Appeals, Second Circuit.

Submitted Nov. 24, 1976.

Decided March 18, 1977.

Sipser, Weinstock, Harper, Dorn & Leibowitz, New York City (Richard Dorn, New York City, of counsel), for appellants.

Louis J. Lefkowitz, Atty. Gen., New York City (Samuel A. Hirshowitz, First Asst. Atty. Gen., Robert S. Hammer, Asst. Atty. Gen., New York City, of counsel), for appellees.

Before MANSFIELD, VAN GRAAFEILAND and MESKILL, Circuit Judges.

VAN GRAAFEILAND, Circuit Judge:

The issue in this case is simply stated. Can a union, which has organized a number of nursing homes in the State of New York, sue the State to secure an increase in Medicaid payments to the homes in order that the union may negotiate higher salaries for its members? The District Judge held that it could not. We believe that he was right.

The State of New York, as a participant in the Federal Medicaid program under Title XIX of the Social Security Act, 42 U.S.C. § 1396 *et seq.*, must adopt a plan for medical assistance and have it approved by the Secretary of Health, Education and Welfare. 45 C.F.R. §§ 201.2 and 201.3. The plan must provide for the payment of the reasonable cost of inpatient hospital services in accordance with the standards and principles prescribed for the Medicare program. 42 U.S.C. § 1396a(a)(13)(D); 45 C.F.R. § 250.30(a)(2)(i).

Prior to 1969, the State of New York reimbursed hospitals on the basis of their actual costs. Finding that this was becoming increasingly expensive, the State, in May 1969, amended § 2807 of its Public Health Law to provide that payments must be reasonably related to the cost of the "efficient" production of the covered services. Hospital and nursing facilities were classified by groups, depending upon geographical location, size, etc., and each group was treated as a unit for the purpose of establishing rates. The institutions were thenceforth advised in advance of their proposed rate schedules so that they could plan their budgets accordingly. In order to accomplish this, a base year is used for the computation of actual costs; and adjustments are made thereafter, based upon intervening changes in costs and hospital related economic factors in the following so-called "trending" year, in order to establish the rate for the ensuing year.[1] Under this plan, the State does not reimburse nursing homes on the basis of their actual costs but pays, instead, at a prospective reimbursement rate which is reasonably related to the costs of the services performed. *Broadacres Skilled Nursing Facility v. Ingraham*, 51 A.D.2d 243, 245, 381 N.Y.S.2d 131 (3d Dept. 1976). The State believes that this accords with the provisions of § 1396a(a)(30) which requires the State to assure that payments "are not in excess of reasonable charges consistent with efficiency, economy, and quality of care". *See, e. g., Sigety v. Ingraham*, 29 N.Y.2d 110, 116, 324 N.Y.S.2d 10, 272 N.E.2d 524 (1971).

In November 1975, the State amended 10 NYCRR § 86.21(k), enacted pursuant to

---

1. For a general discussion of the New York plan *see Presbyterian Hospital in the City of New York v. Ingraham*, 48 A.D.2d 491, 369 N.Y.S.2d 738 (1st Dept. 1975), *aff'd*, 39 N.Y.2d 867, 386 N.Y.S.2d 217, 352 N.E.2d 135 (1976).

Public Health Law § 2807, to provide as follows:

Effective for fiscal years ending in 1976 and thereafter, allowable costs per unit of service (inpatient day, clinic visit, etc.) in a base year will not include any cost increases over the prior year which are in excess of the inflation factor used by the Department in determining the reimbursement rate in effect during such base year unless the cost increases in the base year resulted in a rate revision during the rate year in accordance with Section 86.17.[2]

Although this regulation was intended to take effect on November 26, 1975, it was not approved by the Secretary of HEW as required by 42 U.S.C. § 1396a(b) until August 1976.[3] In the meantime, on February 9, 1976, appellants commenced this action challenging the legality of the regulation. In their complaint, they sought judgment for the following relief:

(1) Declaring that, insofar as the regulation forbids full payment of the actual reasonable cost of inpatient services, "including the costs of reasonable employee wage and benefit increases negotiated in collective bargaining agreements", it violates the Federal Medicaid statutes and regulations.

(2) Directing that, so long as New York State participates in the Medicaid plan, it must provide the full actual and current costs of inpatient services, including the costs of increases in employee wages and benefits negotiated in collective bargaining agreements.

(3) Declaring the regulation invalid as an encumbrance and restraint on collective bargaining under the United States Labor Management Relations Act.

(4) Enjoining the enforcement of the regulation and any other regulation which prohibits or restricts the payment of the actual reasonable current costs of health care services.

Following the service of their complaint, appellants moved for an order preliminarily enjoining the State from effectuating and enforcing the regulation. Instead of granting their motion, the District Court dismissed the complaint, holding that appellants were without standing to seek relief for alleged violations of 42 U.S.C. § 1396a and that the complaint failed to state a claim for alleged violation of the Labor Management Relations Act. It is this judgment which we affirm.

It has by now been well established that both welfare recipients and welfare providers (e. g., nursing homes) have standing to challenge alleged violations of the Social Security laws. *Rosado v. Wyman,* 397 U.S. 397, 420, 90 S.Ct. 1207, 25

---

**2.** 10 NYCRR § 86.17 provides:

(a) The State Commissioner of Health may consider only those applications for prospective revisions of certified rates which are based on

(1) requests for revisions in 1975 reimbursement rates for cost increases incurred prior to the effective date of this section;

(2) errors made in the rate computation process or in the submission by a medical facility which have been brought to the attention of the Commissioner within the time limits prescribed in Section 86.16;

(3) significant increases in the over-all operating costs of a medical facility resulting from the implementation of additional programs, staff or services specifically mandated for the facility by the Commissioner;

(4) significant increases in the overall operating costs of a medical facility resulting from capital renovation, expansion, replacement or the inclusion of new programs, staff or services approved for the medical facility by the Commissioner;

(5) requests for waivers of any provisions of Part 36 for which waivers may be granted by the Commissioner as prescribed in specific sections; and

(6) changes in the method of providing services which result in a lower over-all cost for the services provided.

**3.** 45 C.F.R. § 201.3 provides that after approval of an original State plan by the Department of Health, Education and Welfare "all relevant changes, required by new statutes, rules, regulations, interpretations, and court decisions, are required to be submitted currently so that the [Department] may determine whether the plan continues to meet Federal Requirements and policies."

L.Ed.2d 442 (1970); *Singleton v. Wulff,* 428 U.S. 106, 96 S.Ct. 2868, 49 L.Ed.2d 826 (1976); *Massachusetts General Hospital v. Sargent,* 397 F.Supp. 1056, 1059 (D.Mass. 1975). However, we find nothing in the Federal Medicaid statutes and regulations which gives standing to the providers of the providers, *i. e.,* employees, medical supply houses, laundries, etc. which service nursing homes. A comparison of this case with the Supreme Court's recent decision in *Singleton v. Wulff, supra,* satisfies us that such right of suit does not exist.

In *Singleton,* two physicians brought suit against Missouri state officials challenging the constitutionality of a Missouri statute which denied Medicaid payments for abortions not "medically indicated". The Court was unanimous in holding that, because the physicians, as providers, would be reimbursed under the Medicaid program if permitted to perform the proscribed abortions, the relationship between the parties was "classically adverse", and a case or controversy existed. However, only five of the nine justices believed that the doctors were entitled to base a claim for relief upon the constitutional rights of their patients.

While recognizing that ordinarily one may not claim standing to vindicate the constitutional rights of a third party, Mr. Justice Blackmun, for himself and three other justices, stated that the court should look to two factual elements to determine whether an exception to the rule would be made. 428 U.S. at 114–16, 96 S.Ct. 2874–2875. The first involves the relationship between the plaintiff and the person whose right he seeks to assert. If that person's enjoyment of the right in question is "inextricably bound up with the activity the litigant wishes to pursue", and if the plaintiff "is fully, or very nearly, as effective a proponent of the right" as the person who possesses it, one factual element exists. *Id.* at 114–15, 96 S.Ct. at 2874. The other factual element involves the ability of the third party to assert his own right. If there is "some genuine obstacle to such assertion", the plaintiff becomes by default the right's best available proponent. *Id.* at

116, 96 S.Ct. at 2875. Although not joining this portion of Justice Blackmun's opinion, Mr. Justice Stevens agreed that under the circumstances present in *Singleton,* the doctors could assert the constitutional rights of their patients.

Mr. Justice Powell, writing for himself, the Chief Justice, Justices Stewart and Rehnquist, dissented from the majority's holding on this point. Justice Powell agreed that the general rule prohibits a party from attacking governmental action on the ground that it infringes the rights of some third party. He felt, however, that an exception to this rule should be made only when the third party's assertion of his own rights "is in all practicable terms impossible". *Id.* at 126, 96 S.Ct. at 2880.

Appellants herein are clearly not in the same position as the physician "providers" in *Singleton.* Although their contention that they will be damaged by State action which limits increases in Medicaid payments to nursing homes may be accepted as true, the statutory and constitutional rights which they are seeking to assert are solely those of the homes. Medicaid makes no provision for payment to nursing home employees or their unions. Appellants claim, therefore, "falls squarely within the prudential standing rule that normally bars litigants from asserting the rights or legal interests of others in order to obtain relief from injury to themselves." *Warth v. Seldin,* 422 U.S. 490, 509, 95 S.Ct. 2197, 2210, 45 L.Ed.2d 343 (1975).

Moreover, no factual elements exist which would bring appellants' claim within the exceptions to this rule recognized by either Justice Blackmun or Justice Powell in *Singleton.* The principles formulated for reimbursement of nursing home services are required to give recognition to such factors as depreciation, interest, bad debts, educational costs, compensation of owners, allowances for reasonable return on equity capital of proprietary facilities, services of unpaid workers, discounts and allowances, etc. 20 C.F.R. § 405.402. The interests of the homes and appellants are not inextricably bound together in these matters. More-

over, appellants would not be nearly as effective proponents of the rights of the nursing homes in these areas as would the homes themselves. Finally, there is nothing to suggest that there is any "genuine obstacle" to the nursing homes' assertion of their own rights or that such assertion is "in practicable terms impossible". Indeed, a review of the published opinions shows that nursing homes have been active advocates on their own behalf. *See, e. g., Sigety v. Ingraham, supra; Broadacres Skilled Nursing Facility v. Ingraham, supra; Board of Monroe Community Hospital v. Ingraham,* 80 Misc.2d 950, 364 N.Y.S.2d 795 (Sup. Ct.1975). In short, while union and employer, like the proverbial lion and lamb, may coexist in negotiated peace, we see nothing in this relationship which empowers the union to litigate with the State concerning the nature and extent of the employer's Medicaid rights.

■ Appellants' claim of Labor Law violation is completely without substance. There is no requirement under the New York plan that any home accept patients at the announced rates. If they find that they cannot realize a profit, they have the choice of either making their operation more efficient or not accepting Medicaid patients. *Sigety v. Ingraham, supra,* 29 N.Y.2d at 115, 324 N.Y.S.2d 10, 272 N.E.2d 524. Appellants, adopting the philosophy that the tail should be able to wag the dog, wish to negotiate higher wages for nursing home employees and then force the State to pay for them. With one New York county after another teetering on the brink of financial disaster because of State enforced Medicare and Medicaid contributions,[4] adoption of appellants' proposed course of action could well furnish the final impetus leading to financial chaos. We see nothing in the Labor Management Relations Act of 1947, 29 U.S.C. § 141 *et seq.,* which mandates such a result.

■ The announced purposes of that act are to prescribe the legitimate rights of employees and employers, to prevent the interference by either with the legitimate rights of the other, and to define and proscribe practices on the part of labor and management which are inimical to the general welfare. 29 U.S.C. § 141. Under the Act, it is the employer who is precluded from interfering with the employee's right to bargain collectively, 29 U.S.C. § 158(a), and the NLRB is empowered to prevent any such unfair labor practice. 29 U.S.C. § 160. There is nothing in the Act which requires a third person to advance an employer sufficient funds to reimburse him for wage increases reached as the result of collective bargaining, and no unfair labor practice results from the failure to do so. Insofar as appellants' complaint alleges a conflict between the Medicaid regulations and the Labor Management Relations Act, it fails to state a claim and was properly dismissed.

■ Appellants argue finally that the complaint should not have been dismissed without their being given leave to amend. However, no request for such relief was made to the District Court. *See Swan v. Board of Higher Education of the City of New York,* 319 F.2d 56, 61 (2d Cir. 1963). Moreover, appellants fail to disclose what additional allegations they would make which might lead to a different result. Absent some indication as to what appellants might add to their complaint in order to make it viable, *see Christophides v. Porco,* 289 F.Supp. 403, 408 (S.D.N.Y.1968), we see no reason to grant appellants relief in this Court which was not requested below.

The judgment appealed from is affirmed.

MANSFIELD, Circuit Judge (dissenting):

I must respectfully dissent for the reason that in my view appellants, as agents for health care employees whose compensation

---

4. Under the New York State Medicaid plan, N.Y. Social Services Law § 363, *et seq.,* (McKinney 1976), the major responsibility for providing medical assistance lies with the local social services districts. N.Y. Social Services Law § 365 (McKinney 1976). While the State provides some reimbursement for the funds expended by these agencies, the local contribution to Medicaid is substantial. N.Y. Social Services Law § 368–a, subd. 3(d) (McKinney 1976).

is frozen by the New York State regulation in question, 10 N.Y.C.R.R. § 86.21(k), have standing to attack it on the grounds that (1) it precludes payment of "reasonable" costs (which includes wages) as that term is used in the Social Security Act, 42 U.S.C. § 1396a(a)(13)(D); and (2) it places an undue burden upon the right of non-profit health facility employees to bargain collectively as authorized by the Labor Management Relations Act, 29 U.S.C. §§ 151, *et seq.* (LMRA). I believe it was error for the district court to dismiss their complaint *sua sponte* without giving the plaintiffs an opportunity to demonstrate their compliance with standing requirements and to introduce evidence in support of their claims on the merits.

Title XIX of the Social Security Act, 42 U.S.C. §§ 1396, *et seq.* (Federal Medicaid Program), authorizes the federal government, in furtherance of a cooperative federal-state program, to fund up to 60% of the reasonable cost of inpatient hospital or nursing home services provided by qualified institutions in a state, subject to certain conditions. One of these is that the state wishing to participate in the Federal Medicaid Program submit to the Secretary of Health, Education and Welfare (HEW) for approval a plan obligating the state to pay the non-federal share (40%) of such Medicaid payments, 42 U.S.C. § 1396a(a)(2), and providing for payment of the "reasonable cost of inpatient hospital services provided under the plan," § 1396a (a)(13)(D). In computing the reasonable cost of services "All necessary and proper expenses of an institution in the production of services, including normal standby costs, are recognized," 20 C.F.R. §§ 205.20 and 405.402. Thus it is beyond dispute that the term includes wages paid to employees represented by appellants.

New York's plan provides in essence that each year's reimbursement will be calculated prospectively, based on the previous year's costs. The year for which reimburse-

ment is being calculated is the "rate year," and the year used as the basis for calculating costs is the "base year." 10 N.Y.C.R.R. § 86.11. To the actual costs incurred during the base year ("the allowable basic rate") is added an inflation factor ("a factor to project allowable cost increases during the effective period of the reimbursement rate"). 10 N.Y.C.R.R. § 86.15(b).

In November 1975 the state amended 10 N.Y.C.R.R. § 86.21(k) to provide that in determining base year costs for the purpose of these calculations, no cost increases over the year previous to the base year, except as allowed by the inflation factor, will be taken into account. Assuming that the amendment takes effect for fiscal years ending in 1976, as its terms state, this implies that the reimbursement rate thereafter will be the costs for the fiscal year ending in 1974 plus yearly adjustments for inflation. In August 1976 § 86.21(k) was approved by HEW.[1]

The current suit was precipitated by negotiations between the appellant local, which has been joined here by its national parent, and Lakeshore Nursing Home (Lakeshore), Rochester, New York. According to plaintiffs, whose affidavits must be accepted as true for present purposes, the parties to the negotiations agreed on a $.30 per hour wage hike. Of that amount $.20 per hour was required to meet the state's minimum wage law requirements. Approval of the settlement was sought from the state Department of Health, which refused to allow reimbursement for the added $.10 per hour on the basis of § 86.21(k). In other words, so long as the regulation remains in effect, employees at Lakeshore will be limited to the state's minimum wage plus cost of living increases, unless the nursing home can obtain funds to pay the employees more than that from non-Medicaid patients or other sources.

Faced with the state's denial, on the basis of § 86.21(k), of any greater reimbursement, hospitals and nursing homes, which

---

1. The Secretary's approval has mooted appellants' claim that § 86.21(k) was invalid on the ground that it had not been approved by HEW.

Cf. *Hospital Association of New York State, Inc. v. Toia,* 73 F.R.D. 565 (S.D.N.Y., 1976, opinion of Judge Morris E. Lasker).

rely upon the Federal Medicaid Program for reimbursement of as much as 90% of their costs (depending on the ratio of Medicaid to non-Medicaid patients at a given institution), have refused to negotiate or to pay any higher wages.[2] The district court noted that "labor is the major expense in the operation of a health facility." According to plaintiff, 60% of hospital and nursing home costs are attributable to salaries and wages of employees. As Judge Metzner stated, "The record shows that health care facilities have already stated to the unions that pay increases over present levels will be impossible as contracts come due, since such increases would not be covered by Medicaid reimbursement except for an inflation factor determined by the Department of Health." Through their unions these employees contend that § 86.21(k) frustrates both the implementation of § 1396a(a)(13)(D), which provides that reimbursement shall be for "reasonable" costs (including reasonable wages) and the operation of the LMRA, which entitles them to bargain collectively for reasonable wages.

It was recognized by the district court and does not appear to be disputed by the majority here that the appellants, as representatives of the health care employees, satisfy the requirements of Art. III of the Constitution for standing.[3] The employees and their representatives can allege and show direct economic injury as the result of the application of § 86.21(k). Thus they have a direct personal stake in the outcome of whether § 86.21(k) violates the provision of § 1396a(a)(13)(D) for reimbursement of "reasonable" costs, including reasonable wages. A "case or controversy" is presented in an adversary setting between parties having a concrete interest at stake, with a logical nexus between appellants and the claim sought to be adjudicated. This is sufficient to confer constitutional standing.

See *Flast v. Cohen*, 392 U.S. 83, 102–03, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968); *Sierra Club v. Morton*, 405 U.S. 727, 732–35, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972); *Data Processing Service v. Camp*, 397 U.S. 150, 152–53, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970); *Warth v. Seldin*, 422 U.S. 490, 498–99, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975); *Singleton v. Wulff*, 428 U.S. 106, 96 S.Ct. 2868, 49 L.Ed.2d 826 (1976).

Apparently conceding the existence of constitutional standing, the majority concludes that appellants may not invoke this court's jurisdiction because they have no rights or interests protected by the federal statutes relied upon by them as the basis for their challenge of § 86.21(k). According to the majority, the only persons who gain rights under § 1936a are the providers (hospitals and nursing homes) and possibly the patients. With this conclusion I must respectfully disagree. It ignores the actual state of affairs, which was well within Congress' contemplation when it enacted the Federal Medicaid Program.

The object of the Federal Medicaid Program is to provide essential health services. While it is true that the owners of hospitals and nursing homes, most of whom could not successfully operate without the aid provided by the Program, have a direct interest in the interpretation and application of Title XIX's provisions and the patients as beneficiaries have a similar interest, theirs is not the only interest deriving from the Program. The employees, who are the persons actually engaged in rendering the essential services (as distinguished from providing or patronizing the facilities), have an equal if not greater interest than their employers or their patients in the interpretation of Title XIX, and particularly of the term "reasonable" as used in § 1936a(a)(13)(D). It is the employees, not the hospitals, providers of

---

2. Representatives of the League of Voluntary Hospitals and Homes of New York City, Inc., which represents over 50 hospitals and nursing homes in New York City, have refused to negotiate any increases in wages or fringe benefits over and above those reimbursable under § 86.-71(k).

3. The unions' right, as the representatives of the health services employees in this litigation, to any standing enjoyed by their members is not disputed. See *Warth v. Seldin*, 422 U.S. 490, 511, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975) (reaffirming the principle of representational standing).

patients, who render the health services and are the ultimate recipients of the funds being paid and reimbursed under the Program, with the hospitals acting for the most part merely as conduits. The jobs, wages and livelihood of most health service employees depend directly upon the reimbursement provisions of the Program, without which most providers could not employ them. On the other hand, since the employer is reimbursed under the Program, he is not as much concerned with increasing his employees' compensation to a reasonable level as are his employees. Since the employer will suffer from paying substandard wages only if his employees engage in a work stoppage or if the compensation is insufficient to attract competent help, he has little incentive to challenge a regulation such as § 86.21(k), whereas the employees have a very real and direct concern.

Thus appellants are not voicing a generalized grievance or seeking to enforce the interest of third parties; they are asserting their own direct and vital interest, which is at stake. I would hold that they meet recognized standards for prudential standing and should be held to have an implied right under § 1396a(a)(13)(D), as persons "arguably within the zone of interests to be protected or regulated" by that statute, see *Data Processing Service v. Camp*, 397 U.S. 150, 153, 90 S.Ct. 827, 830, 25 L.Ed.2d 184 (1970), to assert a claim that § 86.71 is inconsistent with the term "reasonable costs" as used in § 1396a(a)(13)(D). Since the practical effect of § 86.21(k) is to place a ceiling upon their wages by precluding reimbursement of any larger amount under § 1396a(a)(13)(D), the statute and regulation, when read together, constitute a "regulation" of their compensation. Aside from appellants' unique relationship, we have here another unusual prudential circumstance strongly militating in favor of standing. Unless appellants are permitted to bring suit, it is unlikely that those recognized by the majority as entitled to standing—the providers and the patients—will do so, at least until there is a serious work stoppage or unavailability of employees, since the effect of § 86.21(k) is to lower labor costs for the providers, while the patients do not have a sufficient interest at stake as long as the hospitals and homes continue to operate. Except to the extent that substandard wages may result in strikes or inability to attract competent help, therefore, the hospitals and patients would have little or no interest in seeking to obtain reasonable wages for the employees. The real parties in interest, those who are presently "aggrieved," are the underpaid employees. Their only alternative, once they are denied standing, is to engage in crippling strikes which will close down the health care institutions, adversely affecting the public interest and violating the principles underlying the LMRA. To force appellants to resort to work stoppages rather than to the courts as a means of asserting their rights does not seem to me to constitute a very "prudential" rule of standing.

For these reasons appellants are the "proper proponents of the particular rights on which they base their suit," *Singleton v. Wulff, supra*, 428 U.S. at 112, 96 S.Ct. at 2873. The failure of the Federal Medicaid Program to name the employees and the fact that it provides for reimbursement rather than for direct advances to the employees are matters of form, not substance. Most of the money "reimbursed" by the federal government is paid over to the employees, with the employers acting essentially as conduits. From a substantive viewpoint, therefore, the employees' interest is directly affected.

Even if the employees were viewed as indirect beneficiaries of the Program, the Supreme Court's observation in *Warth* is pertinent:

"The fact that the harm to petitioners may have resulted indirectly does not in itself preclude standing. When a governmental prohibition or restriction imposed on one party causes specific harm to a third party, harm that a constitutional provision or statute was intended to prevent, the indirectness of the injury does not necessarily deprive the person harmed of standing to vindicate his

rights. *E. g., Roe v. Wade*, 410 U.S. 113, 124 [93 S.Ct. 705, 35 L.Ed.2d 147] (1973).

\* \* \* \* \* \*

"In several cases, this Court has allowed standing to litigate the rights of third parties when enforcement of the challenged restriction against the litigant would result indirectly in the violation of third parties' rights. See, *e. g., Doe v. Bolton*, 410 U.S. 179, 188 [93 S.Ct. 755, 35 L.Ed.2d 147] (1973); *Griswold v. Connecticut*, 381 U.S. 479, 481 [85 S.Ct. 1678, 14 L.Ed.2d 510] (1965); *Barrows v. Jackson*, 346 U.S. 249 [73 S.Ct. 1031, 97 L.Ed. 1586] (1953)." 422 U.S. at 504–05, 510, 95 S.Ct. at 2208, 2211.

More recently in *Singleton v. Wulff*, 428 U.S. 106, 96 S.Ct. 2868, 49 L.Ed.2d 826 (1976), the Supreme Court, following these principles, held that two physicians who performed abortions reimbursable under the Medicaid Program had standing to attack the constitutionality of a Missouri anti-abortion statute and that standing was not limited to their patients. There, as here, since the physicians stood to benefit through payment for their services, constitutional standing was not questioned. With respect to prudential standing Justice Blackmun, speaking for four members of the Court, was of the view that the closeness of the physician-patient relationship and the unlikelihood that patients would assert their rights, made it appropriate to allow the physicians to do so. Justice Powell, speaking for four other Court members, while concurring in the result, disagreed with this reasoning, asserting that as a general rule a party should not be permitted to assert the rights of a third party, lest the court become "roving commissions" engaged in the business of issuing advisory opinions, and that such permission had been granted in the past only when the official action under attack had had an "impact" upon or "direct interference" with the relationship between the plaintiff and the third party. Speaking of prior decisions upholding a person's right to assert *jus tertii*, Justice Powell said:

"In each instance the State directly interdicted the normal functioning of the physician-patient relationship by criminalizing certain procedures. In the circumstances of direct interference, I agree that one party to the relationship should be permitted to assert the constitutional rights of the other, for a judicial rule of self-restraint should not preclude an attack on a State's proscription of constitutionally protected activity. See also *Meyer v. Nebraska*, 262 U.S. 390 [43 S.Ct. 625, 67 L.Ed. 1042.] (1923)." at 128, 96 S.Ct. at 2881.

The plaintiffs in the present case qualify for standing under either the principles espoused by Justice Blackmun or the reasoning of Justice Powell. The employers and their employees constitute a close, mutually interdependent relationship similar to that of the physician and patient in *Singleton*, and § 86.21(k) constitutes a "direct interference" with that relationship by preventing the employer from paying reasonable wages that will avoid a strike or work stoppage. The employers, furthermore, like the patients there, have little or no incentive to sue.[4]

Were there any doubt about the appellants' standing to challenge § 86.21(k), several other factors favor their standing here. First of these is § 10 of the Administrative Procedure Act, 5 U.S.C. § 702, which be-

---

**4.** The majority suggest that if standing is granted to health services employees to attack § 86.21(k), the doors will be open to suits by other "providers of the providers" such as "medical supply houses, laundries, etc." This fear is unjustified. Suppliers and other independent contractors do not stand in the same close relationship to the providers as do employees who devote their entire working hours to personal rendition of the health services regulated by the Act. In contrast, the supplier is usually one of several competing contractors who are not so wedded to the provider as to be dependent entirely upon him. Furthermore, payments to the suppliers represent a much smaller percentage of the provider's outlay than the 60% paid to employees. However, should there be any dispute as to these significant differences in status, the proper remedy is a hearing on the issue rather than a summary dismissal of the complaint.

came applicable upon approval of § 86.21(k) by the Secretary of HEW. It provides:

"A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute is entitled to judicial review thereof."

Here there can be no dispute about the fact that the employees represented by appellants are "adversely affected" and "aggrieved" by HEW's action in approving § 86.21(k) and are suffering injury as long as that regulation precludes them from negotiating wages.[5]

Another and even more cogent factor favoring standing for appellants is found in the provisions of the Labor-Management Relations Act, 29 U.S.C. §§ 151, *et seq.*, which were amended by Congress in 1974 to extend its provisions to employees of non-profit health care institutions, including those represented by appellants.[6] The objective of the LMRA, of course, is to promote the free flow of commerce, general welfare and industrial peace by encouraging the resolution of labor disputes through collective bargaining rather than by work stoppages. See LMRA § 1(b), 29 U.S.C. § 141(b); *Vaca v. Sipes*, 386 U.S. 171, 182, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967); *NLRB v. American National Insurance Co.*, 343 U.S. 395, 401–02, 72 S.Ct. 824, 96 L.Ed. 1027 (1952). Appellants here contend that as long as § 86.21(k) places a ceiling on salaries and wages payable to health service employees by employers who are almost completely dependent upon reimbursement under the Medicaid Program for the continuance of their hospitals or nursing homes the effect of § 86.21(k) will be to turn the pertinent provisions of LMRA into a dead letter in New York. Since the LMRA was enacted for appellants' benefit and the employees' rights under it are thus threatened by § 86.21(k), I agree with the district court that they have standing under LMRA to

challenge the validity of § 86.71(k) on the ground that it adversely affects their bargaining rights.

On the merits, however, the district court, while recognizing that appellants had standing under the LMRA to attack § 86.-21(k), held that the complaint failed to state a claim for relief. Judge Metzner reasoned that the wage freeze imposed by § 86.21(k) could not preclude the employers from bargaining in good faith because "the available sources of income are not limited to Medicaid reimbursement" and "limitations on the sources of income do not connote refusal to bargain in good faith." I disagree. To the extent that providers would rely upon fees received from non-Medicaid patients as the source of funds used to pay any wage increases above the freeze imposed by § 86.-21(k), the providers would be violating federal regulations to the effect that the costs of Medicaid patients should not be shifted to private patients, see 20 C.F.R. §§ 402(b)(3), 405. This policy was made clear by Congress in the Senate Report accompanying the original Medicaid bill, which stated:

"Although payment may be made on various bases the objective, whatever method of computation is used, will be to approximate as closely as practicable the actual cost (both direct and indirect) of services rendered to the beneficiaries of the program so that under any method of determining costs, *the costs of services of individuals covered by the program will not be borne by individuals not covered, and the costs of services of individuals not covered will not be borne by the program.*" S.Rep.No.404, 89th Cong., 1st Sess. (1965), reprinted at 1965 U.S.Code Cong. & Admin.News, p. 1976. (Emphasis supplied).

Nor do I agree that the non-existence of alternative sources of income to the em-

---

**5.** Although the Secretary of HEW has not been named as a party, this formality could easily be remedied by permitting appellants to amend their complaint upon remand to name him.

**6.** As amended § 2(14), 29 U.S.C. § 152(14) defines a health care institution as "any hospital, convalescent hospital . . ., nursing home, extended care facility, or other institution devoted to the care of sick, infirm or aged person."

ployer does not preclude bargaining in good faith. When a provider has established a health service institution which depends heavily upon Medicaid reimbursement (as much as 90% in some instances), it is unrealistic to suggest, as does the majority, that in response to a regulation that precludes payment of "reasonable" costs as authorized by the Act he has the "choice of either making [his] operation more efficient or not accepting Medicaid patients." Whether or not we may personally agree with the Federal Medicaid Program, it depends for its success on the ability of providers to employ competent health service employees at reasonable, competitive rates. If such rates cannot be paid because of the New York regulation under attack, it is no answer to tell providers dependent on the Program that they can go out of business.

Whether the interpretation of the "reasonable costs" provision of the Medicaid Act embodied in § 86.21(k) conflicts with the language of that Act or conflicts with the good faith bargaining provisions of the LMRA are questions so inextricably intertwined that, in may view, it is necessary to consider them simultaneously. I would therefore find an implied right of action in favor of the appellants under the Administrative Procedure Act, the Medicaid Act, and the LMRA to challenge the validity of § 86.21(k) and remand for the development of a record on which we can better consider the merits of these issues.

Finally, in support of its conclusion that appellants must be denied standing, the majority concludes without supporting data that some state governmental subdivisions are on "the brink of financial disaster" because of their "Medicare and Medicaid contributions" and that appellants merely "wish to negotiate higher wages for nursing home employees and then force the State to pay for them." While such a statement may have appeal for conservative voters, it ignores the limit placed by § 1396a upon reimbursement of providers, which restricts them to "reasonable" costs. I do not believe that we are experts on what constitutes "reasonable" wages that may be paid to health service employees and reimbursed by the state. However, I am confident that Congress did not intend to permit the states to require providers to pay sweat-shop or substandard wages, as is claimed by appellants and apparently tolerated by the majority on the theory that it would make the providers' "operation more efficient."

Both the state and federal governments can surely use means other than a flat prohibition against any wage increases at all, which is the method used by § 86.21(k), to prevent appellants from gouging the providers, and thus the state, or forcing them to pay excessive wages. I see no reason, for instance, why governmental representatives, armed with the usual elaborate labor statistics kept by governmental agencies, including prevailing wages for comparable work, could not attend key bargaining sessions (such as those conducted with the League of Voluntary Hospitals and Homes of New York, Inc., which represents 50 hospitals and homes in the City of New York), and assist in establishing reasonable levels that would form a pattern for the industry. The important point, however, is that the issue of standing should not be resolved here on the basis of whether some of the state's subdivisions need to be rescued from "the brink of financial disaster," but upon a fair analysis of who has been injured by the challenged regulation, and how.

For these reasons I would reverse and remand the case to the district court for further proceedings, including the making of a record with respect to issues raised by this dissent and the taking of evidence as to other sources of providers' income, the practical effects and alternatives to § 86.21(k), and the merits.