724 F.2d 383
 3 Soc.Sec.Rep.Ser. 342, Medicare&Medicaid Gu 33,540
NEW JERSEY SPEECH-LANGUAGE-HEARING ASSOCIATION, a New Jersey
corporation; New Jersey Association of Speech Pathologists
and Audiologists in Private Practice, a New Jersey
corporation, Jules Kronengold, M.A.; Irwin Blake, Ph.D.;
and Harriet Schwartz, M.A., on behalf of themselves as
speech-language pathologists and all other entities and
persons similarly situated,
v.
PRUDENTIAL INSURANCE COMPANY OF AMERICA, a New Jersey
corporation; United States Department of Health and Human
Services; Richard Schweiker, Secretary of Health and Human
Services; Health Care Financing Administration and Carolyn
K. Davis, Administrator, Health Care Financing Administration.
Appeal of NEW JERSEY SPEECH-LANGUAGE-HEARING ASSOCIATION,
New Jersey Association of Speech Pathologists and
Audiologists in Private Practice, Irwin
Blake, Ph.D., and Harriet Schwartz, M.A.
 No. 83-5118.
 United States Court of Appeals,
Third Circuit.
 Argued Nov. 3, 1983.
Decided Dec. 29, 1983.
 
 Barry H. Ostrowsky (argued), H. Neil Broder, Dean Kant, Brach, Eichler, Rosenberg, Silver, Bernstein & Hammer, P.A., Roseland, N.J., for appellants.
 Judy Sello, Asst. U.S. Atty. (argued), W. Hunt Dumont, U.S. Atty., Ronald H. Clark, Asst. U.S. Atty., Newark, N.J., for appellees.
 Before ALDISERT, HUNTER and WEIS, Circuit Judges.
 OPINION OF THE COURT
 JAMES HUNTER, III, Circuit Judge:
 
 
 1
 Plaintiffs in this civil action are two organizations of speech pathologists and audiologists and three individually named speech therapy professionals. They brought suit against the United States Department of Health and Human Services ("HHS"), the Health Care Financing Administration ("HCFA"), Prudential Insurance Company of America ("Prudential") in its capacity as a fiscal intermediary under the Medicare Program, and several individual officers of HHS and HCFA who were responsible for administering the Medicare Program. Plaintiffs challenge the amount received by skilled nursing facilities from Prudential for services rendered by plaintiffs under contract with the nursing facilities and the procedure by which that reimbursement was calculated. Plaintiffs have contracted to accept the amount of Medicare reimbursement as payment in full for the services that they render. The thorough opinion of the United States District Court for the District of New Jersey sets forth in great detail the nature of plaintiffs' claims and the scope of the Medicare statutory provisions and regulations upon which they ground their suit. See New Jersey Speech-Language-Hearing Association v. Prudential Insurance Co. of America, 551 F.Supp. 1024 (D.N.J.1982) [hereinafter cited as New Jersey Speech ].
 
 
 2
 Under the relevant provisions of Title XVIII of the Social Security Act, 42 U.S.C. Secs. 1395 to 1395-xx (1976 & Supp. V 1981) ("the Medicare Act"), skilled nursing facilities will be reimbursed for the "reasonable cost" of speech therapy services provided to Medicare patients "under arrangement" with independent medical professionals or associations such as plaintiffs. Id. Sec. 1395f. Skilled nursing facilities are among a number of "providers" eligible to participate in the program and receive reimbursements. Id. Sec. 1395x(v)(4). It is clear from the language of the Medicare Act that only "providers" may be reimbursed directly from the government; suppliers of services, the class within which these plaintiffs fall, must independently contract with a provider to determine the amount of their compensation. Id. Sec. 1395x. Plaintiffs concede as much. [Brief for Appellants at 7-8].
 
 
 3
 The district court dismissed plaintiffs' claims for lack of standing.[1] The court held that independent suppliers of speech therapy services could not satisfy either the constitutional or the prudential requirements that must be met before a party may request the adjudication of the claims at issue here. 551 F.Supp. at 1029. We find much force in the reasoning of the district court, but we affirm on more narrow grounds. See New Jersey Chapter Inc. of American Physical Therapy Association, 502 F.2d 500, 504 (D.C.Cir.1974), cert. denied, 420 U.S. 1004, 95 S.Ct. 1444, 43 L.Ed.2d 762 (1975). We hold that the Medicare Act itself evidences a specific congressional intent to preclude suppliers of covered services, as distinguished from providers, from seeking judicial review of Medicare reimbursement procedures or amounts. Accordingly, we will affirm.
 
 I.
 
 4
 The requirements for standing to sue in the federal courts are well established; the application of those criteria to a particular case, however, is not always clear. See Association of Data Processing Service Organizations, Inc. v. Camp, 397 U.S. 150, 151, 90 S.Ct. 827, 829, 25 L.Ed.2d 184 (1970) ("Generalizations about standing to sue are largely worthless as such."). Parties seeking to challenge administrative actions must satisfy the constitutional prerequisites derived from the "case or controversy" clause of Article III, as well as a set of prudential requirements adopted by the courts to ensure, at a minimum, that parties come forward only to raise distinct personal interests broadly within the scope of the regulatory scheme. Id. at 153, 90 S.Ct. at 829; Gladstone, Realtors v. Village of Bellwood, 441 U.S. 91, 100, 99 S.Ct. 1601, 1608, 60 L.Ed.2d 66 (1979); see Colonial Penn Insurance Co. v. Heckler, 721 F.2d 431 (3d Cir.1983). "The federal courts have abjured appeals to their authority which would convert the judicial process into 'no more than a vehicle for the vindication of the value interests of concerned bystanders.' " Valley Forge Christian College v. Americans United for Separation of Church & State, Inc., 454 U.S. 464, 473, 102 S.Ct. 752, 759, 70 L.Ed.2d 700 (1982) (quoting United States v. SCRAP, 412 U.S. 669, 687, 93 S.Ct. 2405, 2416, 37 L.Ed.2d 254 (1973)).
 
 
 5
 The district court correctly identified the constitutional and prudential standing requirements as set forth by the United States Supreme Court in a line of decisions culminating in Valley Forge Christian College:
 
 
 6
 [A]t an irreducible minimum, Art. III requires the party who invokes the court's authority to "show that he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant," and that the injury "fairly can be traced to the challenged action" and "is likely to be redressed by a favorable decision."
 
 
 7
 ....
 
 
 8
 Beyond the constitutional requirements, the federal judiciary has also adhered to a set of prudential principles that bear on the question of standing. Thus, this Court has held that "the plaintiff generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." ... Finally, the Court has required that the plaintiff's complaint fall within "the zone of interests to be protected or regulated by the statute or constitutional guarantee in question."
 
 
 9
 454 U.S. at 472, 474-75, 102 S.Ct. at 758, 759-60 (citations omitted); see New Jersey Speech, 551 F.Supp. at 1029-30.
 
 
 10
 Plaintiffs do not quarrel with the criteria for standing articulated here and in the district court. Rather, they contend that they have satisfied each of the constitutional and prudential requirements. Plaintiffs have entered into contracts with Medicare providers which require that plaintiffs accept the amount of Medicare reimbursement received by the nursing facility as payment in full for plaintiffs' speech therapy services. 551 F.Supp. at 1030. In addition, they allege that, as a practical matter, Medicare providers cannot afford to pay more to speech therapists and audiologists than the providers receive from the government as reimbursement for those same services. Thus, plaintiffs contend, the injury that they have suffered and will continue to suffer is real, and the interest that they seek to vindicate is their own. Indeed, in light of the agreement that plaintiffs have negotiated with the providers, the providers retain little present interest in challenging unreasonably low reimbursements.
 
 
 11
 Plaintiffs further contend, as they must, that the interest they seek to protect is "arguably within the zone of interests to be protected or regulated" by the Medicare Act. See Association of Data Processing Service Organizations, Inc., 397 U.S. at 153, 90 S.Ct. at 830; Kirby v. United States, 675 F.2d 60, 64 (3d Cir.1982).[2] They argue that speech therapy professionals, although not permitted to receive reimbursement for their services directly from the government, are nonetheless regulated by the Medicare Act. Regulations promulgated under the Act require that participating skilled nursing facilities provide speech pathology and audiology services as needed by their patients. 42 C.F.R. Sec. 405.1126 (1982). The regulations prescribe the qualifications of speech pathologists and audiologists, id. Sec. 405.1101(t), and set forth the requirement of a written treatment plan for speech therapy services in certain instances in order to secure Medicare reimbursement to the provider, see id. Sec. 405.250. Moreover, plaintiffs caution against an overly narrow reading of the zone of interest requirement. They argue that, although it is clear that the Medicare patient was the ultimate focus of congressional interest, suppliers of medical services, along with providers, are integral components of a broad-based scheme for delivering needed medical care to the aged and infirm. Plaintiffs therefore contend that their interest in receiving reasonable compensation for their services is within the zone of interests that may be asserted in the federal courts.
 
 II.
 
 12
 Thus stated, the standing question in this case would be a difficult one. An additional aspect of the standing issue, however, has not been specifically addressed by plaintiffs and requires that standing to sue be denied in this case. Simply stated, the Medicare Act expressly grants standing to parties other than suppliers of services to challenge the very type of reimbursement procedures and decisions challenged in this case. We believe that the express grant of standing to providers evidences a congressional intent to preclude parties such as these plaintiffs from bringing suit.
 
 
 13
 This court has recognized that, in deciding whether standing exists to challenge administrative action under a federal statutory scheme, the statute itself must be scrutinized to determine whether Congress has expressed an intent to circumscribe the class of plaintiffs that may initiate an action:
 
 
 14
 Although the precise limits of Congressional power over federal jurisdiction are not clearly drawn, it is settled law that Congress can in legislating confide certain decisions to the discretion of administrative officials, prohibiting judicial review of the correctness of those decisions. Similarly, subject to due process dictates, Congress can provide for administrative action and limit to a specified class the right to seek judicial review. Thus, where administrative action is challenged as violative of a statute, federal courts must ascertain whether Congress has prohibited or provided for "review at the behest of the plaintiff."
 
 
 15
 Davis v. Romney, 490 F.2d 1360, 1364 (3d Cir.1974) (emphasis added) (citations omitted).
 
 
 16
 The separate opinion of Justice Frankfurter in L. Singer & Sons v. Union Pacific Railroad, 311 U.S. 295, 305-08, 61 S.Ct. 254, 258-60, 85 L.Ed. 198 (1940), which was joined by four other justices, is instructive in our consideration of the case now before us. In L. Singer & Sons, the city of Kansas City, Missouri sought to challenge the extension of a railroad line into Kansas City, Kansas, arguing that the extension would divert commerce from the Missouri city. Standing was predicated on subsection 1(20) of the Transportation Act, which provided for injunctive relief in the federal courts "at the suit of the United States, the [Interstate Commerce] Commission, any commission or regulated body of the state or states affected, or any party in interest." Transportation Act, ch. 91, Sec. 1(20), 41 Stat. 456, 477 (1920) (repealed).
 
 
 17
 In rejecting Kansas City's plea for standing, Justice Frankfurter noted that Congress had expressly included several "public agencies" other than cities within the class of entities that could sue in federal court. "It is reading Sec. 1(20) without illumination of the scheme and purposes of the Transportation Act to expand the categories of public agencies explicitly named by Congress for enforcing Sec. 1(18) by including a city as a 'party in interest.' To do so would disregard [Congress's] recognition of a state utility commission as the special repository of all the interests of a state in this particular field, and of the Interstate Commerce Commission as the national organ for enforcing the body of interstate commerce acts." L. Singer & Sons, 311 U.S. at 305-06, 61 S.Ct. at 258-59 (Frankfurter, J.). The five concurring justices reasoned that Congress's express inclusion of some public entities evidenced an intent to exclude non-enumerated public agencies, such as cities, from the definition of "party in interest."
 
 
 18
 We, too, believe that the standing of plaintiffs in the case before us "depends on the scheme of enforcement that Congress has devised for the Act." Id. at 305, 61 S.Ct. at 259 (Frankfurter, J.). We further believe that congressional intent to deny standing to suppliers of services, as distinguished from providers, is clearly illustrated by the enforcement scheme of the Medicare Act. Congress has expressly adopted a detailed scheme for administrative and judicial review of reimbursement decisions by fiscal intermediaries at the request of providers. 42 U.S.C. Sec. 1395oo (1976 & Supp. V 1981). Subsequent amendments to the Medicare Act have extended the provider's right to judicial review beyond mere determinations of the reimbursement amount:
 
 
 19
 Providers shall also have the right to obtain judicial review of any action of the fiscal intermediary which involves a question of law or regulations relevant to the matters in controversy whenever the Board determines (on its own motion or at the request of a provider of services ...) that it is without authority to decide the question, by a civil action commenced within sixty days of the date on which such determination is rendered.
 
 
 20
 Id. at Sec. 1395oo(f)(1) (Supp. V 1981). In light of this detailed legislative scheme for provider review, we cannot believe that Congress intended to permit suppliers of services to raise the same types of claims under the Medicare Act. Indeed, plaintiffs in this case seek a right of review even broader than that afforded to providers, because the suppliers have skirted the prior administrative avenues clearly mandated in cases initiated by providers.
 
 
 21
 The cases upon which plaintiffs rely did not consider whether Congress had expressly or impliedly limited standing to review reimbursement decisions under the Medicare Act, but confined their analysis to the constitutional and prudential concerns discussed in Part I of this opinion. See, e.g., Cotovsky-Kaplan Physical Therapy Associates v. United States, 507 F.2d 1363 (7th Cir.1975); Pacemaker Monitor Corp. v. United States, 440 F.Supp. 473 (S.D.Fla.1977). We further observe that Cotovsky-Kaplan and Pacemaker were decided before Congress amended the Medicare Act to provide expressly for judicial review of "any action of the fiscal intermediary which involves a question of law or regulations" regardless of whether the agency had authority to decide such a question in the first instance. 42 U.S.C. Sec. 1395 oo(f)(1) (Supp. V 1981).
 
 
 22
 Our decision today is entirely consistent with this court's decision in Colonial Penn Insurance Co. v. Heckler, 721 F.2d 431 (3d Cir.1983). Plaintiff in Colonial Penn was an insurance company challenging a Medicare regulation that limited benefits for medical expenses covered under automobile insurance policies. The Medicare Act contains no express grant of standing to any party to assert the claim raised by the plaintiff insurance company. Thus, no persuasive argument can be made that Congress had intended to "limit to a specified class the right to seek judicial review" of the claims in Colonial Penn. See Davis v. Romney, 490 F.2d 1360, 1364 (3d Cir.1974).
 
 
 23
 We recognize that there are due process limitations on congressional power to preclude affected parties from seeking judicial review of agency actions. Id. This case, however, certainly does not involve congressional overreaching. Plaintiffs here argue that they are regulated under the Medicare Act, but they must concede that they were and are free to negotiate with providers regarding the amount to be paid for their speech therapy services. Nothing in the Medicare Act requires that plaintiffs enter into agreements with Medicare providers and certainly nothing in the Act dictates the terms of such agreements. In addition, the economic interests of suppliers of services are nearly congruent with the interests of providers, to whom standing has been given. It may be true that plaintiffs in this case, by agreeing to accept the reimbursement amount received by the nursing homes as payment in full, have undercut the providers' financial interest in challenging the actions of defendants. We may not, however, ignore the will of Congress in order to relieve plaintiffs from the unfortunate consequences of an improvident private bargain.
 
 III.
 
 24
 Accordingly, for the reasons set forth above, we will affirm the order of the district court dismissing plaintiffs' claims.
 
 
 25
 WEIS, Circuit Judge, dissenting.
 
 
 26
 The majority states the issue before us as whether "suppliers" of covered services as distinguished from "providers" have standing to seek "judicial review of Medicare reimbursement procedures or amounts." This formulation of the plaintiffs' cause of action, I believe, does not adequately describe the issues at stake. As I read the plaintiffs' complaint, it does not simply present a reimbursement challenge. Rather, plaintiffs attack the failure of Medicare officials to promulgate guidelines as required by regulation and by statute. With that view of the litigation, I conclude that plaintiffs have standing and a jurisdictional basis for this suit.
 
 
 27
 I start with the proposition that in addressing a question of standing on a motion to dismiss, trial and reviewing courts must accept as true all material allegations in the plaintiffs' complaint. Warth v. Seldin, 422 U.S. 490, 501, 95 S.Ct. 2197, 2206, 45 L.Ed.2d 343 (1975). See also Gladstone Realtors v. Village of Bellwood, 441 U.S. 91, 115 & n. 31, 99 S.Ct. 1601, 1616 & n. 31, 60 L.Ed.2d 66 (1979) (pleadings and discovery material considered; factual allegations for standing must be supported adequately by evidence at trial). The complaint in this case alleges that plaintiffs furnish services under arrangement with a skilled nursing facility and that they have been and will continue to be paid consistent with standards established by Prudential, the fiscal intermediary. Plaintiffs assert that HCFA, "a principal operating component" of HHS, 551 F.Supp. at 1025-26, is responsible for issuing reimbursement guidelines but has failed to issue any for speech pathology services. Complaint at paragraphs 67-68. To fill this void, Prudential has adopted its own standards which were allegedly derived by misapplication of reasonable cost reimbursement principles, and were incorrectly based on unrelated guidelines. See Complaint at paragraphs 53, 60, 62. As a result of Prudential's action and HCFA's inaction, plaintiffs contend they are denied the reasonable value of their services.[1]
 
 
 28
 Specifically, the complaint avers that "HCFA has consistently refused to act and has failed to develop, promulgate and issue any speech pathology GUIDELINES, all in violation of its statutory authority and duty." Complaint at p 70; see also Complaint at paragraphs 67-68, 75. HCFA guidelines would supersede the measures used by Prudential and presumably would be more favorable to plaintiff. Thus, plaintiffs allege that they suffer and will continue to suffer injury because of the governmental agency's lack of compliance with its obligation to promulgate guidelines. Although adoption of guidelines would not require Medicare to pay suppliers directly, plaintiffs suggest that the issuance of proper rules would increase government payments to nursing homes.
 
 
 29
 In the realities of the market place, the amount that the Medicare Program reimburses a nursing home for speech pathology services has a direct impact on what a speech pathologist working "under arrangement" will be paid. It is fanciful in the extreme to imagine that a nursing home will pay its speech pathologist more than the amount it may be reimbursed by Medicare for that specific service.
 
 
 30
 Although the pinch is felt first by the nursing home, that does not deny standing to plaintiffs. In Warth v. Seldin, 422 U.S. at 504-05, 95 S.Ct. at 2207-08, the court said, "The fact that the harm to petitioners may have resulted indirectly does not in itself preclude standing." When governmental action against one party causes a third party to suffer a specific harm that a statute was intended to prevent, the indirectness of the injury does not necessarily deprive the injured person of standing. However, it may make it "more difficult to meet the minimum requirements of Art. III: to establish that, in fact, the asserted injury was the consequence of the defendants' actions, or that prospective relief will remove the harm." Id. at 505, 95 S.Ct. at 2208.
 
 
 31
 Simon v. Eastern Kentucky Welfare Rights Organization, 426 U.S. 26, 41-42, 96 S.Ct. 1917, 1925-1926, 48 L.Ed.2d 450 (1976), reiterated the requirement that a federal court may act "only to redress injury that fairly can be traced to the challenged action of the defendant, and not injury that results from the independent action of some third party not before the court." The Court denied standing in that case because it was speculative "whether the denials of [hospital] service specified in the complaint fairly can be traced to [Internal Revenue Service] 'encouragement' or instead result from decisions made by the hospitals without regard to the tax implications." Id. at 42-43, 96 S.Ct. at 1926-1927. See also Valley Forge Christian College v. Americans United for Separation of Church and State, Inc., 454 U.S. 464, 472, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982).
 
 
 32
 Here, however, the complaint alleges facts from which it is fairly inferable that the preparation and issuance of appropriate guidelines will grant plaintiffs some relief. Their position is that as a result of HCFA's inaction, Prudential developed and applied a reimbursement methodology without proper notice to or consultation with plaintiffs. In contrast, when HCFA acts, guidelines are issued "after consultation with the appropriate therapy organization," Provid.Reimb.Man., Part I Sec. 1406.2, Medicare & Medicaid Guide (CCH) p 5849D-23,[2] and notice of promulgation is required, 42 C.F.R. Sec. 405.432(d).[3] The complaint avers that as a result of the lack of opportunity to comment and Prudential's failure to consider some of the factors relevant to a proper determination of reimbursement levels, "[t]he artificial amounts set forth by Prudential for the cost of speech pathology services were and are well below the actual cost of providing said services in the State of New Jersey." Complaint at p 63.
 
 
 33
 Plaintiffs have thus asserted economic detriment as a result of the failure to include pertinent elements in the formulation of guidelines. These deficiencies would be cured by HCFA promulgating independent guidelines after its required consultation with plaintiffs and after consideration of comments received following publication of the proposed guidelines. The standing prerequisites of establishing an expectancy of prospective relief, as well as the causal link between the challenged failure to act and the plaintiffs' detriment, have thus been met.
 
 
 34
 Any doubt about whether standing can exist even though the effect is only indirect would appear to have been settled by Columbia Broadcasting System, Inc. v. United States, 316 U.S. 407, 62 S.Ct. 1194, 86 L.Ed. 1563 (1942). There, the Court confronted Federal Communication Commission regulations that by their terms were applicable to individual broadcasting stations and did not directly govern the plaintiff network. The district court dismissed, but the Supreme Court found standing, saying,
 
 
 35
 "Appellant's standing to maintain the present suit in equity is unaffected by the fact that the regulations are not directed to appellant and do not in terms compel action by it or impose penalties upon it because of its action or failure to act."
 
 
 36
 Id. at 422, 62 S.Ct. at 1202. The Court found it was enough that the regulations purportedly operated to "alter and affect adversely appellant's contractual rights and business relations with station owners" whose licenses might be revoked as a result of the regulations. Id.; see also United States v. SCRAP, 412 U.S. 669, 683-690, 93 S.Ct. 2405, 2413-2417, 37 L.Ed.2d 254 (1973).
 
 
 37
 Plaintiffs have established economic detriment to themselves, both present and future, although the shock of the impact travels through the nursing homes acting as conduits. The injury to plaintiffs and the controversy presented fulfill the requirements of Article III.
 
 
 38
 The next step in the standing analysis focuses on prudential considerations--judicial rules limiting cases that courts may consider, even when Article III has been satisfied. Defendants observe that only nursing homes receive reimbursement and have direct contact with the Medicare program. Therefore, defendants argue, plaintiffs have no standing under a prudential standard because they are not within the "zone of interests" that the statute and regulations were intended to regulate and protect. See generally, Association of Data Processing Service Organizations, Inc. v. Camp, 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970); Colonial Penn Insurance Co. v. Heckler, 721 F.2d 431 at 434-435 (3d Cir.1983).[4] But the circumstances in this case clearly demonstrate that this test has been met.[5]
 
 
 39
 In general, beneficiaries and providers are within the zone of interests of the Medicare Act. See Colonial Penn, at 435. Although plaintiffs are not in either category, they are at least arguably regulated by the provisions at issue in this case. As the majority observes, "regulations prescribe the qualifications of speech pathologists ... and set forth the requirement of a written treatment plan for speech therapy services...." See also 42 C.F.R. Secs. 405.1101(t), 405.1121(i), 405.1126 (1982).
 
 
 40
 In addition, the Act provides that "[w]here ... speech therapy services ... are furnished under an arrangement" with a nursing home, the amount included in any payment to the nursing facility "as the reasonable cost of such services ... shall not exceed ... the salary" that the nursing home would have paid to an employee for the services plus certain allowances, "as the Secretary may in regulations determine to be appropriate." 42 U.S.C. Sec. 1395x(v)(5)(A) (1976).
 
 
 41
 In Cotovsky-Kaplan Physical Therapy Assoc., Ltd. v. United States, 507 F.2d 1363 (7th Cir.1975), the plaintiffs were physical therapy organizations affected by a regulation that, as a condition of Medicare participation by home health agencies, precluded that provider from entering into an arrangement with those plaintiffs. In rejecting an attack on standing, the Court of Appeals said, "To focus on whether the plaintiffs are directly regulated themselves is to read the Data Processing test too narrowly. The test is not whether these plaintiffs are regulated by the statute but whether the interests asserted by them arguably fall within the zone of interests so regulated." Id. at 1366. Cf. Granville House, Inc. v. Department of Health & Human Services, 715 F.2d 1292, 1299 (8th Cir.1983).
 
 
 42
 The case at hand is as strong for standing as Cotovsky-Kaplan, and is readily distinguishable from National Union of Hospital & Health Care Employees v. Carey, 557 F.2d 278 (2d Cir.1977). In the latter case, a union of nursing home employees was held to lack standing to challenge a statute limiting increases to the total level of reimbursement paid to the homes under Medicaid. In that case, Medicaid did not determine the specific allowable costs for routine employment expenditures, and the interests asserted by the union were viewed as those of the providers. As the court remarked in addressing the question of third-party standing, "The interests of the homes and appellants are not inextricably bound together in these matters." Id. at 281.
 
 
 43
 Even if this assessment of the various interests at stake was correct, see National Union, 557 F.2d at 284-85 (Mansfield, J., dissenting), a different situation is presented in the case at hand. As we have seen, Congress has specifically instructed the Secretary to establish by regulation the reasonable cost of plaintiffs' services within the perimeters set forth in the statute. 42 U.S.C. Sec. 1395x(v)(5)(A). The relationship between plaintiffs here and the nursing homes, as well as the plaintiffs' interests, are not separate and distinct from the home's interest in or relationship with the Medicare program. Since the provider acts primarily as a conduit for payment, the plaintiffs' own, independent interests can be viewed as implicated by this statutory provision.
 
 
 44
 The district court believed, however, that plaintiffs were not affected by the Act because they were free to bargain with the nursing home operators for higher compensation. 551 F.Supp. at 1032. The implied premise underlying this rationale is that the nursing homes could recoup the cost of the plaintiffs' services not covered by Medicare from some other source--presumably from patients not eligible for Medicare.
 
 
 45
 Aside from underestimating nursing home dependence on Medicare, that approach overlooks the congressional policy of having Medicare pay its own way. The Senate report accompanying the original Medicare bill stated that the payments were to be computed so that "the costs of services of individuals covered by the program will not be borne by individuals not covered, and the costs of services of individuals not covered will not be borne by the program." S.Rep. No. 404, 89th Cong., 1st Sess., reprinted in 1965 U.S.Code & Adm.News 1943, 1976. See also id. at 2126; Chelsea Community Hospital, SNF v. Michigan Blue Cross Association, 630 F.2d 1131, 1136 (6th Cir.1980); 42 U.S.C. Sec. 1395x(v)(1)(A).[6]
 
 
 46
 It is clear to me that the practical and policy strictures on the plaintiffs' independent course of action place them inescapably within the scope of interests arguably regulated by Medicare. The pervasive regulatory scheme sets standards for competency that speech therapists must meet, requires certain procedures to be followed for the planning of treatment, and in a very practical sense places a ceiling on their compensation. The majority concedes that in this context the standing question is "difficult" but I find it difficult to argue that plaintiffs are not within the zone of interests sought to be regulated.
 
 
 47
 The majority avoids a frontal assault on this question and, instead, attempts to flank the issue by directing attention to what it sees as an implied legislative denial of standing to suppliers of services such as plaintiffs. That line of attack, however, clashes head-on with the general principle that judicial review of agency action "will not be cut off unless there is persuasive reason to believe that such was the purpose of Congress" and "only upon a showing of 'clear and convincing evidence' of a contrary legislative intent should the courts restrict access to judicial review." Abbott Laboratories v. Gardner, 387 U.S. 136, 140, 141, 87 S.Ct. 1507, 1510, 1511, 18 L.Ed.2d 681 (1967). See also Dunlop v. Bachowski, 421 U.S. 560, 568, 95 S.Ct. 1851, 1858, 44 L.Ed.2d 377 (1975). As the Supreme Court observed in Association of Data Processing Service Organizations, Inc. v. Camp, "There is no presumption against judicial review and in favor of administrative absolutism unless that scheme is fairly discernible in the statutory scheme." 397 U.S. at 157, 90 S.Ct. at 832 (citation omitted). The evidence that the majority presents to meet the clear and convincing test fails to pass muster.
 
 
 48
 In essence, the majority's argument is that since Congress provided an administrative remedy for providers, the nursing homes here, and did not include plaintiff suppliers, the latter are barred from seeking judicial review of agency action. This contention, however, loses its force in light of the type of dispute that the administrative process was intended to resolve and the nature of the plaintiffs' cause of action here.
 
 
 49
 The administrative review provision cited by the majority, 42 U.S.C. Sec. 1395 oo (1976 & Supp. V 1981), is intended to permit appeals by the provider from determinations of the fiscal intermediary on usual claims for reimbursement. This limitation on the range of issues eligible for consideration by the Provider Reimbursement Review Board is evidenced by the statute's delineation of when a provider may seek review under this provision. In general, resort to the Board is available if the provider is dissatisfied "as to the amount of total program reimbursement." 42 U.S.C. Sec. 1395oo (a)(1)(A).[7] By implication, the administrative process may in some instances also consider provider challenges to the application of regulations. See id. Sec. 1395oo (f)(1) (right of immediate judicial review if Board determines that it is without authority to decide question of law). After administrative exhaustion, judicial review is provided.
 
 
 50
 The purpose of the administrative mechanism is clear. It is intended to resolve routine reimbursement claims, and some legal questions in the same limited area. By channeling reimbursement claims in this fashion, the courts will not be overloaded with disputes that can be adequately handled in the administrative process.
 
 
 51
 If plaintiffs here were presenting only individual claims for reimbursement, the majority's argument would have greater force. Plaintiffs, however, seek relief because of the agency's failure to issue guidelines. It should be obvious that under section 1395oo, the Board has no authority to direct the agency to comply with regulations. The administrative proceeding is and must be confined to adjudication of claims for amounts presented. The Provider Reimbursement Review Board has no authority to direct that its parent agency take affirmative steps to comply with law. Cf. H.Rep. No. 1167, 96th Cong., 2d Sess., 394, reprinted in 1980 U.S.Code Cong. & Ad.News 5526, 5757 ("Board has no authority, for example, to rule on the legality of the Secretary's regulations....")In United States v. Erika, 456 U.S. 201, 102 S.Ct. 1650, 72 L.Ed.2d 12 (1982), the Supreme Court concluded that Congress intended to preclude judicial review of a carrier's determination of the amount of benefits awardable under Part B of the Medicare Program, a voluntary program supplementing the general coverage of Part A at issue here. The Court reached its result, however, after observing that the statute in question, 42 U.S.C. Sec. 1395ff, expressly allowed for judicial review of administrative determinations in only two situations, not applicable in that case. 456 U.S. at 206-08, 102 S.Ct. at 1653-54. Congressional committee reports established a clear legislative intent to restrict review to those instances, id. at 208-211, 102 S.Ct. at 1654-1655, "in order to avoid overloading the courts with quite minor matters," id. at 209, 102 S.Ct. at 1655. In the face of the "statute's precisely drawn provisions" and the specifically expressed intent of Congress, the Supreme Court held that judicial review was barred.
 
 
 52
 In this case no such specific statutory exclusion applies to the issue of an agency's failure to act, and no clear statement of legislative intent is present suggesting limited judicial review. Here there is only silence. That does not supply the "clear and convincing evidence" necessary to preclude review. An attempt to restrict judicial review in Medicare cases based on a rationale similar to that employed by the majority here was rejected by the court of appeals in National Association of Home Health Agencies v. Schweiker, 690 F.2d 932, 941-42 (D.C.Cir.1982), cert. denied, --- U.S. ----, 103 S.Ct. 1193, 75 L.Ed.2d 438 (1983). See also Starnes v. Schweiker, 715 F.2d 134, 138-39 (4th Cir.1983).
 
 
 53
 Additionally, it is significant that the cause of action plaintiffs assert is based on the defendants' failure to enact guidelines, an issue of national import. This case is not simply one of the numerous individualized claims for reimbursement. Insofar as one of this suit's basic complaints is that defendants failed to meet their obligations to enact guidelines, it is a "one shot" effort. Allowing this action to proceed on that ground would not raise the spectre of flooding the courts with small claims that are perhaps better suited, at least in the first instance, to the administrative process.
 
 
 54
 The circumspection with which the Supreme Court approached the issue in Erika and the basis for its holding are strong evidence that preclusion of judicial review by implication is not favored, even in the Medicare field. That hesitation should govern the question of standing presented here as well.
 
 
 55
 Because I find standing, I must meet the question of jurisdiction. Even though its decision on standing would be dispositive, the district court, in a pragmatic disposition of the issues, addressed the matter of jurisdiction under the federal question provision, 28 U.S.C. Sec. 1331. The court held that jurisdiction on this basis was not available to plaintiffs. With that conclusion, I disagree.
 
 
 56
 In Colonial Penn Insurance Co. v. Heckler, 721 F.2d 431 (3d Cir.1983), this court was presented with a challenge to the availability of section 1331 jurisdiction similar to that urged here. Colonial Penn rejected the argument that 42 U.S.C. Sec. 1395ii barred the exercise of section 1331 jurisdiction over certain statutory and constitutional claims. 721 F.2d at 436-439. We noted the disagreement among the circuits on this complex issue, but chose the approach most consistent with the general presumption in favor of judicial review of administrative decisions.
 
 
 57
 I need not repeat the Colonial Penn analysis here, other than to note that like the situation in that case, plaintiffs here are not primarily presenting a claim for reimbursement. Their complaint seeks prospective relief based on agency failure to enact regulations. In that setting, the argument for section 1331 jurisdiction is stronger than when a claim for payment is presented. See also Starnes v. Schweiker, 715 F.2d at 139-41; National Association of Home Health Agencies v. Schweiker, 690 F.2d at 936-42.
 
 
 58
 We intimated in Colonial Penn that mandamus jurisdiction might also be available. 721 F.2d at 437 n. 2, 439; see also Kuehner v. Schweiker, 717 F.2d 813 (3d Cir.1983). Its application in the case at hand seems even stronger. Here, the regulations specifically require HCFA to issue guidelines, and it has failed to take that course.
 
 
 59
 I would vacate the judgment of the district court and remand for further proceedings.
 
 
 
 [1]
 The district court held, in the alternative, that it lacked subject matter jurisdiction over plaintiff's claims by operation of 42 U.S.C. Sec. 405(h) (1976). Because of our disposition of the standing issue, we need not address that question
 
 
 [1]
 The district court held, in the alternative, that it lacked subject matter jurisdiction over plaintiffs' claims by operation of 42 U.S.C. Sec. 405(h) (1976). Because of our disposition of the standing issue, we need not address that question
 
 
 [2]
 This court recently discussed the continued vitality of the "zone of interest" requirement in Colonial Penn Ins. Co. v. Heckler, 721 F.2d 431 at 434-435 (3d Cir.1983)
 
 
 [1]
 There are other allegations in the plaintiffs' broad-based attack, but I believe that those cited present the plaintiffs' best case and the one we should accept. See Warth v. Seldin, 422 U.S. at 501, 95 S.Ct. at 2206
 
 
 [2]
 The Provider Reimbursement Manual, Part I, Sec. 1406.2, provides in part:
 "Schedules of guidelines for ... therapy services and other services will be issued, as necessary, after consultation with the appropriate therapy organization."
 
 
 [3]
 Title 42 C.F.R. Sec. 405.432(d) provides:
 "(d) Notice of guidelines to be imposed. Prior to the beginning of a period to which a guideline will be applied, a notice will be published in the FEDERAL REGISTER establishing the guideline amounts to be applied to each geographical area by type of therapy."
 
 
 [4]
 There has been some speculation whether this test should be applied or poses any substantial barrier. See 4 K. Davis, ADMINISTRATIVE LAW TREATISE Sec. 24:17 (2d ed 1983); 13 C. Wright, A. Miller, and E. Cooper, FEDERAL PRACTICE AND PROCEDURE Sec. 3531 at 196 (1975). Nevertheless, the Supreme Court has continued to discuss it. See Valley Forge Christian College, 454 U.S. at 475, 102 S.Ct. at 760 (1982); Gladstone Realtors v. Village of Bellwood, 441 U.S. 91, 100 n. 6, 99 S.Ct. 1601, 1608 n. 6, 60 L.Ed.2d 66 (1979); see also Colonial Penn Insurance Co. v. Heckler, 721 F.2d 431, 434 (3d Cir.1983)
 
 
 [5]
 To the extent defendants contend that plaintiffs are asserting rights of third parties, satisfaction of the zone of interest standard disposes of the argument. "[T]he concept of third-party standing ... creates a limited exception ... to the zone of interest requirement." Bowman v. Wilson, 672 F.2d 1145, 1152 (3d Cir.1982). See also Warth v. Seldin, 422 U.S. at 501, 95 S.Ct. at 2206
 
 
 [6]
 Regulations of the Secretary also reflect this policy. See, e.g., 42 C.F.R. Secs. 405.402(a), 405.420(d), 405.451(b), 405.452(a), 405.2043(a) (1982)
 
 
 [7]
 Under section 1395oo (a)(1), a provider may obtain a hearing with respect to a cost report if the provider
 "(A) is dissatisfied with the final determination of the ... fiscal intermediary ... as to the amount of total program reimbursement due the provider for the items and services furnished to individuals for which payment may be made under this subchapter ...,
 (B) has not received such final determination from such intermediary on a timely basis ..., or
 (C) has not received such final determinations on a timely basis after filing a supplementary cost report...."
 (Emphasis added.)
 That the Provider Reimbursement Review Board is to focus only on reimbursement disputes is further exhibited by the composition of the Board. Section 1395oo (h) states that all "members of the Board shall be persons knowledgeable in the field of cost reimbursement, and at least one of them shall be a certified public accountant." There is no legal training requirement.